Argued and submitted October 2, decision of Court of Appeals and judgment
of circuit court affirmed December 28, 2007

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## DANE LE WHEELER,
*Petitioner on Review.*

(CC 200403014, 200409321;
CA A126025 (Control), A126026; SC S54543)

175 P3d 438

Ingrid A. MacFarlane, Portland, argued the cause and filed the briefs for petitioner on review.

Robert M. Atkinson, Assistant Attorney General, argued the cause and filed the briefs for respondent on review. With him on the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Robert Wilsey, Certified Law Student, Salem.

BALMER, J.

**BALMER, J.**

The issue in this criminal case is whether the life sentences that the trial court imposed on defendant violate the proportionality clause of Article I, section 16, of the Oregon Constitution, which provides that "all penalties shall be proportioned to the offense." A jury convicted defendant of 18 criminal charges, including sexual abuse, sodomy, and using a child in a display of sexually explicit conduct, based on conduct involving three boys between the ages of nine and 15. Defendant previously had been convicted of two felony sex crimes. Based on the convictions in this case and defendant's prior convictions, and acting pursuant to a recidivism statute for felony sex offenders, ORS 137.719(1),[1] the trial court imposed a sentence of life imprisonment without possibility of parole on each of the 18 charges, with the sentences to run consecutively. Defendant appealed, arguing that the sentences were disproportionate to the offenses of which he was convicted. The Court of Appeals affirmed without opinion. *State v. Wheeler*, 209 Or App 379, 148 P3d 925 (2006). We allowed defendant's petition for review and now affirm.

I

In construing the Oregon Constitution, we seek to determine the meaning of the constitutional text by examining the wording of the constitutional provision at issue, the case law surrounding it, and the historical circumstances leading to its adoption. *State v. Ciancanelli*, 339 Or 282, 289, 121 P3d 613 (2005); *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).

"The purpose of our inquiry under the *Priest* methodology is 'to understand the wording [of the constitutional provision] in the light of the way that the wording would have been understood and used by those who created the provision * * * and to apply faithfully the principles embodied in the

---

[1] ORS 137.719(1) provides:

"The presumptive sentence for a sex crime that is a felony is life imprisonment without the possibility of release or parole if the defendant has been sentenced for sex crimes that are felonies at least two times prior to the current sentence."

Oregon Constitution to modern circumstances as those circumstances arise.' "

*Ciancanelli*, 339 Or at 289 (quoting *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 90-91, 23 P3d 333 (2001)).

## A

We begin with the text of Article I, section 16, of the Oregon Constitution. That section provides:

> "Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but *all penalties shall be proportioned to the offense.*—In all criminal cases whatever, the jury shall have the right to determine the law, and the facts under the direction of the Court as to the law, and the right of new trial, as in civil cases."

(Emphasis added.) Before turning to the specific wording, "all penalties shall be proportioned to the offense," we briefly examine the context of that wording. The issue in this case turns on the relationship between crimes and punishment, and the provisions in Article I, section 16, regarding excessive bail and the respective powers of the court and jury in a criminal trial have little bearing on that relationship. The reference to "excessive fines," however, adds some context to the proportionality requirement. Although this case involves imprisonment, rather than a fine, the use of the term "excessive" (rather than the term "proportional") in relation to fines raises the question whether requiring proportionality differs from prohibiting excessiveness. If the Oregon Constitutional Convention had wanted to prevent only *excessive* penalties, it could have indicated as much. Instead, it indicated that penalties should be *proportioned*, and we turn to a consideration of the meaning of that requirement.

■ The term "proportion" indicates a comparative relationship between at least two things. *See, e.g.,* 2 Noah Webster, *An American Dictionary of the English Language* 45 (1828) ("proportion" indicates a "comparative relation"). Here, the two things being related are "penalties" and "the offense," and the provision requires that the penalties for each particular offense be "proportioned"—that is, comparatively related—to that offense. The strong implication of that

requirement is that a greater or more severe penalty should be imposed for a greater or more severe offense, and, conversely, that a less severe penalty should be imposed for a less severe offense. Additionally, by using the article "the" and the word "offense" in the singular, rather than the plural, the text focuses on the "proportion" between a specific offense and the penalties for that offense, rather than on the proportion between the penalty for one offense (*e.g.*, murder) and the penalty for another offense (*e.g.*, theft). However, the constitutional text does not suggest the precise nature of the relationship that is required between the offense and the penalties, nor does it indicate how the severity of an offense is to be measured.

■   It also is unclear, based solely on examining the text, what relationship the second half of the sentence in question ("but all penalties shall be proportioned to the offense") bears to the first half of the sentence ("cruel and unusual punishments shall not be inflicted"). The two phrases could be independent constitutional commands, or the second half of the sentence could modify the first half of the sentence. Specifically, the presence of the conjunction "but" may suggest an exception or some kind of contrast, or it may simply be serving its ordinary function as a conjunction, *viz.*, joining the two clauses into a single sentence without purporting to define the particular relationship between them—whatever it may be. Because "proportionality" and the prohibition of "cruel and unusual punishments" are different concepts, each of which could stand alone as a constitutional requirement, the text of the second sentence of Article I, section 16, suggests that each should be interpreted independently, although the interpretation of one may inform the interpretation of the other. The text, however, does not provide a more specific understanding of the meaning of the proportionality clause, and we therefore turn to the historical background of the clause to seek a fuller understanding of that provision.

B

This court has interpreted Article I, section 16, in a number of decisions, which we discuss below. However, we never have reviewed in any detail the origins of the proportionality requirement in an effort to determine what the

framers of the Oregon Constitution were concerned about, and therefore intended, when they adopted it, and we take the opportunity to do so now.

When the drafters of the Oregon Constitution took the proportionality requirement from the Indiana Constitution of 1851, they did not discuss the meaning of that provision or their reasons for using it. However, the proportionality requirement, in one form or another, has an ancient lineage, dating back to Magna Carta, and the legal requirement that the penalty for a crime be proportional to the offense can be traced from those early sources to the American colonial experience and then to state constitutions adopted in the nineteenth century, including Oregon's. Accordingly, we begin with a brief review of that history.

Concerns about both proportionality and severity in criminal sentencing in English law may be found as early as Magna Carta of 1215[2] and in the English Bill of Rights of 1689.[3] The concerns expressed in those documents did not address imprisonment, however, but rather fines or "amercements," perhaps because, when those documents were written, fines were a far more common form of punishment than imprisonment. Magna Carta provided that fines should

---

[2] The 1215 version of Magna Carta guaranteed proportionate fines (amercements), according to the order to which the inhabitant belonged: freemen, nobles, or clergy.

"(20) A free-man shall not be amerced for a small offence, but only according to the degree of the offence; and for a great delinquency, according to the magnitude of the delinquency, saving his contenement [the lands and chattels connected to a tenement]: a Merchant shall be amerced in the same manner, saving his merchandise, and a villain shall be amerced after the same manner, saving to him his Wainage [tools of husbandry], if he shall fall into our mercy; and none of the aforesaid amerciaments shall be assessed, but by the oath of honest men of the vicinage.

"(21) Earls and Barons shall not be amerced but by their Peers, and that only according to the degree of their delinquency.

"(22) No Clerk shall be amerced for his lay-tenement, but according to the manner of the others as aforesaid, and not according to the quantity of his ecclesiastical benefice."

Ray Stringham, *Magna Carta: Fountainhead of Freedom* 233 (1966) (quoting Magna Carta (1215) (trans Richard Thompson, 1829)).

[3] "[E]xcessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusuall Punishments inflicted." 1 W & M, sess 2, ch 2 (1689), *quoted in Solem v. Helm*, 463 US 277, 285, 103 S Ct 3001, 77 L Ed 2d 637 (1983).

be set according to the "magnitude" or "degree" of the crime—a concept similar to proportionality—and according to the legal status of the offender.

The English Bill of Rights added the prohibition on "excessive fines" and the different concept of "cruel and unusual punishment." The latter provision did not apply to capital punishment or even many forms of corporal punishment, but rather to forms of torture that were illegal or at least not customary. *See* Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Calif L Rev 839, 842 (1969); *Harmelin v. Michigan*, 501 US 957, 966-75, 111 S Ct 2680, 115 L Ed 2d 836 (1991) (opinion of Scalia, J.) (both describing historical background and noting focus of "cruel and unusual punishment" prohibition on illegal sentences and cruel methods of punishment).

The world of Magna Carta and the English Bill of Rights (and the words used in those documents) was so divorced from nineteenth century reality that we would hesitate to rely too heavily on those sources, if they stood alone. Happily, they do not, because William Blackstone and the early American state constitution writers—far more accessible and readable sources—provide a link between the older sources and the text used in the Oregon Constitution. In reviewing the common law of crimes in England in the middle of the eighteenth century, Blackstone maintained that punishment should be proportional to the offense in question and to the social aims of criminal punishment generally. "The method * * * of inflicting punishment ought always to be proportioned to the particular purpose it is meant to serve, and by no means exceed it[.]" 4 William Blackstone, *Commentaries on the Laws of England* 12 (1769). Of course, in Blackstone's time, many crimes still were punishable by death, and this was particularly so if the defendant had committed previous crimes.

> "[T]he pains of death, and perpetual disability by exile, slavery, or imprisonment, ought never to be inflicted, but when the offender appears *incorrigible*: which may be collected either from a repetition of minuter offenses; or from the perpetration of some one crime of deep malignity, which of itself demonstrates a disposition without hope or probability of amendment and in such cases it would be cruelty to

the public, to defer the punishment of such a criminal, till he had an opportunity of repeating perhaps the worst of villanies."

4 Blackstone, *Commentaries* at 12 (emphasis in original). Blackstone described the difficulty of ensuring that punishments are proportional, and recognized that deference should be granted to the legislature's choices:

"As to the *measure* of human punishments. From what has been observed in the former article we may collect, that the quantity of punishment can never be absolutely determined by any standing invariable rule; but it must be left to the arbitration of the legislature to inflict such penalties as are warranted by the nature of laws and society, and such as appear to be calculated to answer the end of precaution against future offenses."

*Id.* (emphasis in original).

Blackstone thus advocated penalties "proportioned" to the purpose of the punishment, whether that be the "amendment" of a particular defendant's disposition to commit crime or the deterrence of "future offenses." He also suggested that the elimination or isolation of dangerous or repeat offenders, in the interest of protecting the greater public, represented one of the important purposes of punishment. We should bear in mind, however, that in mid-eighteenth century England, lengthy imprisonment still was not the most common punishment, and it did not become widespread until the advent of the criminal reformation movements of the early nineteenth century. J.H. Baker, *An Introduction to English Legal History* 584 (3d ed 1990); *see also* Lawrence M. Friedman, *Crime and Punishment in American History* 48, 77-82 (1993); Matthew W. Meskell, Note, *An American Resolution: The History of Prisons in the United States from 1777 to 1877*, 51 Stan L Rev 839 (1999) (discussing same for early period of the United States). Until then, death, corporal punishment, or transportation were common punishments for many serious offenses. Blackstone described what he called the "melancholy truth" that English law prescribed the death penalty for no fewer than 160 different crimes. 4 Blackstone, *Commentaries* at 18-19.

Blackstone emphasized the legislative role in selecting punishments. Indeed, there being no constitutional standards by which an English judge could overrule a legislative choice, his remarks necessarily were directed to legislators and would-be legislators. Regarding the applicability of the death penalty, he wrote: "I would not be understood to *deny* the right of the legislature in any country to enforce its own laws by [requiring] the death of the transgressor * * * but only to suggest a few hints for the consideration of such as are, or may hereafter become, legislators." 4 Blackstone, *Commentaries* at 11 (emphasis in original). In that spirit, Blackstone made certain recommendations with the hope that Parliament would reconsider what he believed to be disproportionately severe penalties, including the death penalty, for many crimes.

> "[T]here cannot be any regular or determinate method of rating the quantity of punishments for crimes, by any one uniform rule; but they must be referred to the will and discretion of the legislative power: yet there are some general principles, drawn from the nature and circumstances of the crimes, that may be of some assistance in allotting it an adequate punishment."

*Id.* at 14-15.

Although Blackstone suggested that fine distinctions in ranges of punishment may be difficult to make and are best left to legislative judgment, he set out a number of principles, at least some of them inspired by his reading of Cesare Beccaria's contemporary treatise on criminal law and punishment, *On Crimes and Punishments* (1764; first English trans 1767).[4] Blackstone, following Beccaria, emphasized rationality in the imposition of punishments, rather than the indiscriminate application of harsh punishments such as the death penalty. Punishment, in Blackstone's view (as influenced by Beccaria), should take into account the manifold complexities of aggravating and extenuating circumstances, including a weighing of the effectiveness of a

---

[4] Beccaria's book included a chapter entitled, "of the proportion between crimes and punishments." Cesare Beccaria, *On Crimes and Punishments* ch 6 (4th ed 1784). Although few in the colonies probably had read Beccaria's book, his ideas reached a greater audience through Blackstone's writings.

particular penalty in preventing future crimes. 4 Blackstone, *Commentaries* at 15-16.

In particular, Blackstone agreed both with Beccaria's observation that the certainty of punishment is more important than severity in preventing future crimes and with Montesquieu's view that the "excessive severity of laws * * * hinders their execution," particularly when jurors withhold conviction if they perceive that the likely punishment will be unjust. *Id.* at 17. He concluded that "punishments of *unreasonable* severity, especially when indiscriminately inflicted, have less effect in preventing crimes, and amending the manners of a people, than such as are more merciful in general, yet properly intermixed with due distinctions of severity." *Id.* at 16-17 (emphasis added).

Blackstone also criticized the use of brutal punishments, which he referred to as "sanguinary laws," as "a bad symptom of the distemper of any state." *Id.* at 17. He was especially critical of the arbitrary and indiscriminate use of such laws, particularly the death penalty.

> "It is moreover absurd and impolitic to apply the same punishment to crimes of different malignity. A multitude of sanguinary laws (besides the doubt that may be entertained concerning the right of making them) do likewise prove a manifest defect either in the wisdom of the legislative, or the strength of the executive power. It is a kind of quackery in government, and argues a want of solid skill, to apply the same universal remedy, the *ultimum supplicium*, to every case of difficulty. It is, it must be owned, much *easier* to extirpate than to amend mankind: yet that magistrate must be esteemed both a weak and a cruel surgeon, who cuts off every limb, which through ignorance or indolence he will not attempt to cure."

*Id.* at 17-18 (emphases in original).

Blackstone's ideas on proportionality contrast with the related but nonetheless distinct concerns regarding cruel and unusual punishments. As noted, the latter focused on the barbarous and uncustomary nature of particular modes of punishment, whereas proportionality required comparison of the crime with the punishment and invited application of the test of reason in the best tradition of the eighteenth century

Enlightenment.[5] Instead of arbitrary and comparatively harsh punishments, Blackstone endorsed an approach to proportionality that took a form not unlike what we now know as criminal sentencing guidelines:

> "It has been therefore ingeniously proposed, that in every state a scale of crimes should be formed, with a corresponding scale of punishments, descending from the greatest to the least; but, if that be too romantic an idea, yet at least a wise legislator will mark the principal divisions, and not assign penalties of the first degree to offences of an inferior rank."

4 Blackstone, *Commentaries* at 18 (footnote omitted).

## C

Blackstone's *Commentaries* were an important influence on reformers, including early state constitution writers, and provisions in a number of state constitutions written in the late eighteenth century reflect Blackstone's concern with proportionality in sentencing. The first American constitution to adopt a clause requiring proportionality in sentencing appears to have been the Pennsylvania Constitution of 1776. That constitution stated that "[t]he penal laws as heretofore used shall be reformed by the legislature of this state, as soon as may be, and punishments made in some cases less sanguinary, and in general more proportionate to the crimes." Pa Const, § 38 (1776); *see also id.* at § 39 (prisons should be constructed "to make sanguinary punishments less necessary"). Similarly, South Carolina's 1778 constitution indicated that "the penal laws, as heretofore used, shall be

---

[5] The difference between a proportionality requirement and a prohibition on "cruel and unusual" punishment continues to divide the United State Supreme Court in its interpretation of the Eighth Amendment. The Court has held that the amendment—which prohibits cruel and unusual punishment, but does not explicitly require proportionality in sentencing—implicitly prohibits "sentences that are disproportionate to the crime committed." *Solem v. Helm*, 463 US 277, 284, 103 S Ct 3001, 77 L Ed 2d 637 (1983). However, at least three members of the Court, based on their understanding of the historical background, have concluded that the Eighth Amendment does *not* impose any proportionality requirement. *See Harmelin v. Michigan*, 501 US 957, 985, 111 S Ct 2680, 115 L Ed 2d 836 (1991) (opinion of Scalia, J., joined by Rehnquist, C. J.); *Ewing v. California*, 538 US 11, 32, 123 S Ct 1179, 155 L Ed 2d 108 (2003) (Thomas, J., concurring). We need not engage in that debate in this case, because defendant does not rely on the Eighth Amendment or on the prohibition on cruel and unusual punishment contained in Article I, section 16, of the Oregon Constitution.

reformed, and punishments made in some cases less sanguinary, and in general more proportionate to the crime." SC Const, Art XL (1778). The reference to "sanguinary" laws echoes Blackstone's criticisms of disproportionately harsh punishments in English law, which the framers of the colonial constitutions saw as applicable to colonial criminal sentences.

Of all the state constitutions from that period, we think the New Hampshire Constitution of 1784 provided the most lucid explanation of the rationale for its provision requiring proportional sentencing:

> "All penalties ought to be proportioned to the nature of the offense. No wise legislature will affix the same punishment to the crimes of theft, forgery and the like, which they do to those of murder and treason; where the same undistinguishing severity is exerted against all offences[,] the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do those of the lightest dye: For the same reason a multitude of sanguinary laws is both impolitic and unjust. The true design of all punishments being to reform, not to exterminate, mankind."

NH Const, Part I, Art XVIII (1784). The foregoing provision seems to be a summary of Blackstone's discussion of proportionality in punishment. *Cf.* 4 Blackstone, *Commentaries* 17 ("It is * * * much easier to extirpate than to amend mankind."). In later years, the Illinois Constitution condensed the New Hampshire text: "All penalties shall be proportioned to the nature of the offence, the true design of all punishment being to reform, not to exterminate, mankind." Ill Const, Art VIII, § 14 (1818); Ill Const, Art XIII, § 14 (1848) (same).

As previously noted, in the eighteenth century the British government punished many offenses by death, from murder to hunting on certain lands to cutting down certain trees. *See, e.g.*, 4 Blackstone, *Commentaries* at 244 (describing the infamous Waltham Black Act, 9 Geo I, c 22 (1723)). Behind the origins of the constitutional provisions requiring proportionality in sentencing was the view that death, the punishment for the indisputably abhorrent crimes of murder and treason, was simply not appropriate for minor property

crimes such as theft and forgery. The adopted provisions also foreshadow the movement that would emphasize the reformation of criminals rather than attempting to prevent crime through overuse of the capital penalty. *See* Friedman, *Crime and Punishment in American History* at 73-82 (describing decline in use of death penalty and increase in imprisonment as a sanction in late eighteenth and early nineteenth centuries).

Notably, many states that included proportionality clauses in their original state constitutions abandoned them in subsequent revisions. In 1790, Pennsylvania and South Carolina abandoned their proportionality clauses in favor of formulations that followed the Eighth Amendment to the United States Constitution, prohibiting excessive fines and cruel and unusual punishments. Pa Const, Art IX, § 13 (1790); SC Const, Art IX, § 4 (1790). Like Pennsylvania and South Carolina, Ohio adopted a proportionality clause only to abandon it later. *Compare* Ohio Const, Art VIII, § 14 (1802) (repeating text from 1784 New Hampshire Constitution) *with* Ohio Const, Art I, § 9 (1851) ("[E]xcessive fines [shall not be] imposed, nor cruel and unusual punishments inflicted.").

The cause for abandonment is not difficult to find. In many states, legislative projects were undertaken to divide significant crimes into degrees (*e.g.*, first-degree murder, second-degree murder), reserving the most severe punishments for crimes committed "in the first degree," and to limit the death penalty generally. *See* Friedman, *Crime and Punishment in American History* at 73-74 (describing scope of such reforms). Thus, in light of criminal sentencing reforms in the early nineteenth century, it is likely that proportionality was no longer widely perceived in those states as a pressing issue that required constitutional guidance.

We turn to the Indiana Constitution, which draws our attention in part because many provisions of the Oregon Constitution were taken from it. The 1816 Indiana Constitution provided: "All penalties shall be proportioned to the nature of the offence." Ind Const, Art I, § 16 (1816). In the 1816 constitution, that provision was contained in a separate section from the provision that instructed that "[e]xcessive bail shall not be required; excessive fines shall not be

imposed; nor cruel and unusual punishments inflicted." Ind Const, Art I, § 15 (1816). In the revised Indiana Constitution of 1851, however, those two sections were merged to read: "Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offence." Ind Const, Art I, § 16 (1851).[6] Unfortunately, the debates on the Indiana Constitution shed little light on the contemporary meaning of the clause.[7]

## D

■  Obviously, the framers of the Oregon Constitution borrowed the two sentences of Article I, section 16, with which we are concerned here, from the Indiana Constitution of 1851. The framers combined the cruel and unusual punishment provision and the proportionality provision—each of which appears in a short, separate sentence in the Indiana Constitution—into a single sentence, connected by the conjunction "but." As we have described above, those provisions have distinct histories and purposes—the proportionality provision has origins in Magna Carta and in Blackstone's argument in favor of punishments that were reasonably related to the severity of particular offenses, while the prohibition on cruel and unusual punishments was first articulated in the English Bill of Rights and focuses on prohibited methods of punishment. Those differences suggest that, when the drafters of the Oregon Constitution combined the two provisions with the word "but" in Article I, section 16,

---

[6] The Indiana Supreme Court has concluded that the provision requires that criminal penalties be "graduated and proportioned to the nature of [the] offense." *Conner v. State*, 626 NE2d 803, 806 (Ind 1993) (so stating in the process of holding that law setting penalty for selling fake drugs at twice the penalty for selling real marijuana violated proportionality clause of Indiana Constitution).

[7] Apparently the only reference to proportionality in sentencing was a rhetorical statement offered by one delegate in the course of arguing against the exclusion of blacks from Indiana (an issue also raised at the Oregon Constitutional Convention):

"[I]f the bare fact of a person of color coming into our State, and demeaning himself in an orderly and peaceful manner, is an offense against society, of so heinous a character as to deserve confinement in the penitentiary, or in the county jail? Would not the punishment in such a case be altogether disproportioned to the nature of the offense?"

*Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 596-97 (1850).

they did not intend the proportionality provision to be an exception or qualification to the bar on cruel and unusual punishments. *See* 1 Noah Webster, *An American Dictionary of the English Language* 29 (1828) (giving "excepting" as one meaning of "but"). Rather, the sentence seems to use the word "but" as the equivalent of "and" and simply to combine in one sentence those two different rules for criminal penalties. *See id.* (giving, as another meaning of "but," "[m]ore; further; noting an addition to supply what is wanting to elucidate, or modify the sense of the preceding part of a sentence, or of a discourse, or to continue the discourse, or to exhibit a contrast"). In other words, the prohibition on cruel and unusual punishment and the requirement of proportionality appear to be independent constitutional commands, joined in one sentence because they both concern appropriate punishment for crimes.

The framers of the Oregon proportionality provision made one other change in the text of the Indiana provision, omitting the words "nature of," and thus requiring that penalties be "proportioned to the offense," rather than "proportioned to the *nature of* the offense." Although the framers left no record indicating why they made that change, the text of the Oregon provision at least suggests that the framers intended the proportionality inquiry to focus on the specific criminal "offense" at issue, rather than on a potentially more open-ended inquiry into the "nature" of the offense. Indeed, the Indiana courts have emphasized that the reference in the Indiana proportionality requirement to the "nature of the offense" indicates that the courts should look behind the legislative classification of the offense and consider the "nature" and "gravity" of the offense of conviction and, in the case of a repeat offender, the "nature" of the prior offenses. *Taylor v. State*, 511 NE 2d 1036, 1039 (Ind 1987). Although it is not clear how application of the Indiana provision would differ in practice from that of the Oregon provision, Article I, section 16, plainly directs us to consider only "the" offense and whether "the" penalties are "proportioned" to that offense.

The Oregon provision has not changed since 1857: "Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the

offense." Or Const, Art I, § 16. Other than suggesting the likelihood that the provenance of the provision was the 1851 Indiana Constitution, the records of the Oregon Constitutional Convention shed no light on the changes or the meaning of the constitutional text. *See Billings v. Gates*, 323 Or 167, 178, 916 P2d 291 (1996) ("Apparently, the Oregon Constitutional Convention passed the [cruel and unusual punishments] clause without recorded discussion."); W.C. Palmer, *The Sources of the Oregon Constitution*, 5 Or L Rev 200, 201 (1926) (Article I, section 16, was taken from Article I, sections 16 and 19, of the Indiana Constitution of 1851); Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 468 (1926) (same). Recent research shows that the sentence in question, taken from the Indiana Constitution, remained the same throughout the convention, although the section disappeared at one point before reappearing in the final version of the draft constitution. Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857, Part I*, 37 Willamette L Rev 469, 521-26 (2001).

Nothing in the records of the constitutional convention indicates that, when the framers of the Oregon Constitution adopted the proportionality requirement, they had any different concerns than those which had led Blackstone and later the framers of state constitutions from Pennsylvania to Indiana to emphasize the need for proportionality in sentencing. We therefore assume that those same concerns animated the Oregon framers. Those concerns, in turn, inform our interpretation of the Oregon provision. At the most basic level, the framers' concern was that the penalty imposed on a criminal defendant be "proportioned" to the specific offense for which the defendant was convicted—that it bear the appropriate "comparative relation" to the severity of that crime.

## II

We turn to this court's previous cases interpreting Article I, section 16. This court first articulated the test for determining whether a sentence violates the proportionality provision of Article I, section 16, in *Sustar v. County Court of Marion Co.*, 101 Or 657, 201 P 445 (1921). The defendant

there had been sentenced to six months in jail and fined $500, the maximum permitted under the applicable statute, for possessing two quarts of "moonshine." The court stated that the trial court "went to the verge by inflicting the extreme penalty, nevertheless, the sentence was within the law." 101 Or at 662. As to the defendant's claim that his sentence nevertheless violated the proportionality requirement, the court quoted a United States Supreme Court case interpreting the cruel and unusual punishment provision of the Eighth Amendment, *Weems v. United States*, 217 US 349, 367, 30 S Ct 544, 54 L Ed 793 (1910), for the proposition that "[i]t is a precept of justice that punishment for crime should be graduated and proportioned to offense."[8] This court then stated:

> "In order to justify the court in declaring punishment cruel and unusual with reference to its *duration*, the punishment must be so proportioned to the offense committed as to *shock the moral sense* of all reasonable men as to what is right and proper under the circumstances."

101 Or at 665 (citing *Weems*) (emphases added).

Since *Sustar,* this court often has used the "shock the moral sense" standard to resolve a claim that a sentence does not meet the proportionality requirement. For example, in *State v. Teague*, 215 Or 609, 611, 336 P2d 338 (1959), the court quoted and applied that test, holding that the trial court's decision to impose a sentence of 15 years' imprisonment for two forgery crimes did not violate the proportionality requirement. Although the court viewed the sentence as severe, given the nature of the crimes and the absence of anything in the record demonstrating that the defendant had a substantial criminal record, it concluded that the sentence did not shock the moral sense of all reasonable people. *Id.* More recently, in *State v. Rogers*, 313 Or 356, 836 P2d 1308 (1992), this court again followed *Sustar*, describing that case as adopting the *Weems* test for cruel and unusual punishment as the test for applying Article I, section 16. *Id.* at 380.

---

[8] Although the quote from *Weems* refers to the concept of proportionality, that case actually involved a challenge to a sentence of 12 years of "hard and painful labor" while shackled by chains. Some have viewed *Weems* as an example of a cruel and unusual *method* of punishment, rather than a disproportionate sentence. *See* Herbert L. Packer, *Making the Punishment Fit the Crime*, 77 Harv L Rev 1071, 1075 (1964) (so arguing).

The court rejected the defendant's argument that imposition of the death penalty for an intentional murder "committed by a person who was attempting to commit sexual abuse in the first degree" was disproportionate, stating that the sentence "would not shock the moral sense of reasonable people." *Id.*

On the other hand, in applying the "moral shock" test, this court sometimes has focused on the legislature's action in setting a particular penalty or range of penalties for a particular crime, rather than the court's view of what would shock the moral sense of reasonable people. For example, in *Jensen v. Gladden,* 231 Or 141, 372 P2d 183 (1962), the court considered a proportionality challenge to a statute under which a person who had previously been convicted of a sex crime and who then was convicted of a second sex crime could be sentenced to imprisonment "for an indeterminate term not exceeding the natural life of such person." The defendant had a prior conviction for contributing to the delinquency of a minor; after a subsequent conviction for indecent exposure, he was sentenced to an indeterminate life sentence. The court quoted the *Sustar* test and then observed that whether a particular sentence would shock the moral sense would "depend on the seriousness of the repetitive sexual conduct of this kind and the danger that it forecasts for others unless the defendant is segregated from society." 231 Or at 144-45. As to that determination of seriousness and danger, the court deferred to the judgment of the legislature:

> "[W]e cannot say that there was not a reasonable basis for the enactment of the punishment provision in ORS 167.050. *It is the province of the legislature to establish the penalties for the violation of the various criminal statutes and if the penalties are founded upon an arguably rational basis we have no authority to hold that they are invalid.*"

*Id.* at 145-46 (footnote omitted; emphasis added).

This court applied a similar "rational basis" test in *State v. Isom,* 313 Or 391, 837 P2d 491 (1992), where the defendant challenged his sentence of death for aggravated murder committed after escaping from prison. The murder was considered aggravated because the defendant was an escapee. ORS 163.095(2)(f) (1991). The defendant argued that the sentencing scheme was disproportionate because, in

the defendant's view, a prisoner who is in the process of escaping is more dangerous than a prisoner that has completed such an escape, yet both are subject to an aggravated penalty. This court disagreed:

> "Defendant's view, that a person in the process of escaping is more dangerous than a defendant who already has escaped, is simply defendant's opinion. The problem for defendant is that the legislature apparently had a different opinion, *i.e.*, it believed that murders intentionally committed by escapees, whether *during or after* the escape, pose a considerable threat to the safety and peace of mind of the general populace. The legislature has chosen to subject all such persons to the maximum potential penalty. Defendant's opinion makes sense, but so does that which we attribute to the legislature. *There was a rational basis for the legislature to conclude that both classes of escapees are dangerous.*"

*Id.* at 400 (first emphasis in original; second emphasis added).

We make two observations about the proportionality test that this court has used since 1921, *viz.*, whether the penalty "shocks the moral sense of all reasonable people as to what is right and proper under the circumstances." First, we do not think the court intended the test literally—that is, that a penalty for a particular crime would meet the proportionality requirement if a single "reasonable person" could be found whose moral sense was not "shocked" by that penalty. Rather, we read the court's words as attempting to articulate a standard that would find a penalty to be disproportionately severe for a particular offense only in rare circumstances.[9] Second, and relatedly, we view this court's consideration of whether the legislature's imposition of a particular penalty (or range of penalties) for an offense had a "reasonable" or "an arguably rational basis" (*Jensen*) or a "rational basis" (*Isom*) as an effort to apply the *Sustar* test, rather than as establishing an alternative test. Put differently, in those cases, the court did not abandon the "moral shock" test—indeed, both

---

[9] Indeed, in *Rogers*, the court used the *Sustar* test, but omitted the adjective "all" from the reference to "reasonable people," stating that a penalty is not disproportionate if it "would not shock the moral sense of reasonable people." 313 Or at 380.

quoted that test—but rather looked to the legislative enactment of the particular penalties at issue as an external source of law to assist in determining whether those penalties would shock the moral sense of reasonable people.

■ Having considered the test that this court has applied to determine whether a penalty is "proportioned to the offense," we turn to this court's other cases applying the proportionality requirement to determine whether they provide additional guidance for our application of the requirement here. Those cases reinforce our earlier conclusion that the provision prohibits sentences that are disproportionately severe compared to the offense, but that the court will hold a sentence unconstitutional under that provision only in rare circumstances. The cases also establish that the proportionality provision permits the imposition of penalties for repeat offenders that might not be permissible for a single offense.

■ As noted, this court consistently has adhered to the view that "[i]t is the province of the legislature to establish the penalties for the violations of the various criminal statutes[.]" *Jensen*, 231 Or at 146; *see also State ex rel Huddleston v. Sawyer*, 324 Or 597, 615, 932 P2d 1145 (1987) ("Determining the range of possible sentences for particular crimes historically has been a legislative, rather than a judicial, function."). That allocation of responsibility was central to this court's most recent case involving a proportionality challenge to a sentencing law, *State v. Ferman-Velasco*, 333 Or 422, 41 P3d 404 (2002). There, the defendant argued that his Measure 11-based sentences violated the proportionality provision of Article I, section 16, because they were greater than the existing guidelines sentences for equal and more serious crimes. This court rejected the defendant's argument, holding that the law establishing new and greater penalties for certain crimes itself demonstrated that those crimes were more serious—and that the greater sentences for those crimes thus were not disproportionate: "[Measure 11] represents the most recent legislative enactment demonstrating the seriousness with which the legislative branch views Measure 11 crimes, including defendant's crimes." *Id.* at 431. Although the court dismissed the defendant's argument on the merits, concluding that the Measure 11 penalties were not disproportionate, implicit in the court's analysis is the

conclusion that the legislature (and the people, acting through the initiative process) has broad authority to determine which crimes are "greater" and therefore deserving of greater penalties, as long as there is some reasonable basis for that decision, as required by *Jensen* and *Isom*. This court thus ensures that constitutional standards are met; however, respect for the separation of powers and the legislature's authority to set criminal penalties means that the court's role is a limited one.

■    This court's cases also underscore the legislature's authority to set enhanced penalties in response to recidivism, an issue of particular importance in assessing the sentence imposed in this case. In *State v. Smith*, 128 Or 515, 273 P 323 (1929), for example, the defendant asserted a disproportionate-sentence argument against a sentence imposed pursuant to a habitual offender statute. The defendant was convicted of receiving stolen property. Because he had been convicted of three prior felonies, the defendant came within the terms of the recidivism statute, and was sentenced to life in prison. In response to his argument that the sentence violated Article I, section 16, the court observed that "[t]he power to declare what punishment may be assessed against those convicted of crime is not a judicial, but a legislative, power, controlled only by the provisions of the Constitution." 128 Or at 524. The *Smith* court cited a number of decisions from other states holding that statutes imposing increased penalties on habitual criminals do not violate the constitutional provision against cruel and unusual punishment. The court did not separately analyze the two parts of Article I, section 16, but rather examined the habitual offender statute against the provision as a whole. The court quoted approvingly from a Washington state case which held that that state's habitual criminal statute "simply provides an increased penalty for the last offense, and does not violate any constitutional right of the accused." The state has an interest in preventing repeat offenders from further crimes, the court stated, " 'and it does no violence to any constitutional guarantee for the state to rid itself of depravity when its efforts to reform have failed.' " *Id.* at 525 (quoting *State v. Le Pitre*, 54 Wash 166, 168, 103 P 27 (1909)). The court observed:

"The defendant in the instant case had previously been convicted of burglary, but the offense for which he was sentenced to life imprisonment, and from which sentence he has appealed to this court, was a lesser crime, the crime of receiving stolen property. Were we to consider this penalty with reference to the defendant's latest offense alone, we would be astounded at its severity. But a careful analysis of the entire record clearly indicates that the defendant is an incorrigible criminal, a man who has heretofore been convicted at least four times for burglariously preying upon the property and safety of others. Add to this the fact that, throughout the history of criminal law, burglary has been looked upon as a crime of great magnitude, and the burglar as a dangerous and desperate criminal, and the sentence imposed in this case can but be deemed a just one."

128 Or at 525-26. Thus, *Smith* emphasized that the analysis must focus not only on the latest crime and its penalty, but on the defendant's criminal history. An enhanced sentence (even a life sentence) is appropriate, and not disproportionate, when a defendant is "an incorrigible criminal."

*Jensen v. Gladden*, 231 Or 141, also concerned a recidivism statute. As noted above, the defendant initially had been convicted of contributing to the delinquency of a minor; two years later he was convicted of the crime of indecent exposure. Under *former* ORS 167.050, the defendant was sentenced to imprisonment "for an indeterminate period not to exceed his natural life." The defendant attacked his sentence under Article I, section 16. The court observed:

"Viewing ORS 167.050 simply as a statute designed to provide for enhanced punishment for recidivists, we would be called upon to decide whether, under the circumstances presented in the instant case, an indeterminate sentence with a maximum of life imprisonment, would necessarily be so disproportionate to the offense that it would 'shock the moral sense of all reasonable men as to what is right and proper under the circumstances.'"

231 Or at 144. The court continued: "Whether it would so shock the moral sense would, of course, depend upon the seriousness of the repetitive sexual conduct of this kind and the danger that it forecasts for others unless the defendant is

segregated from society." *Id.* at 144-45. After briefly discussing what the court acknowledged to be the dimly understood subject of sex crimes and recidivism, the court stated that it was unable to say that there was no reasonable basis for the legislature's conclusion that imprisonment for an indeterminate period was appropriate in light of the seriousness of the conduct and the defendant's danger to society. The court upheld the sentence. *See also Tuel v. Gladden,* 234 Or 1, 379 P2d 553 (1963); *State v. Hicks,* 213 Or 619, 630, 325 P2d 794 (1958) (upholding, against proportionality challenges, statutes providing enhanced sentences for recidivists).

The only two cases in which this court has held that particular penalties violate the proportionality requirement provide further refinement of the court's application of the "moral shock" test—and demonstrate how rarely a sentence within the limits set by the legislature will be found to violate that requirement. Both cases involved situations in which the penalty for a lesser-included offense was greater than the penalty for the greater-inclusive offense. In *Cannon v. Gladden,* 203 Or 629, 281 P2d 233 (1955), the defendant was charged with statutory rape, but was convicted of the lesser-included charge of assault with intent to commit rape. At that time, the maximum penalty for statutory or forcible rape was 20 years, while the maximum penalty for assault with intent to commit rape was life in prison. The defendant in *Cannon* was sentenced to life imprisonment. The court viewed the disparity between the two punishments as raising "a grave constitutional question." *Id.* at 631. Applying the "shock the moral sense" test to the facts of the case, the court held that the sentence violated the proportionality requirement:

> "The question presented is whether the penalty of life imprisonment for an assault with intent to commit rape under the circumstances of this case is proportioned to the offense, or is it so disproportioned to the offense as to shock the moral sense of all reasonable men as to what is right and proper? The question answers itself.

> "How can it be said that life imprisonment for an assault with intent to commit rape is proportionate to the offense when the greater crime of rape authorizes a sentence of not more than 20 years? It is unthinkable, and

shocking to the moral sense of all reasonable men as to what is right and proper, that in this enlightened age jurisprudence would countenance a situation where an offender, either on a plea or verdict of guilty to the charge of rape, could be sentenced to the penitentiary for a period of not more than 20 years, whereas if he were found guilty of the lesser offense of assault with intent to commit rape he could spend the rest of his days in the bastile [*sic*].

"When the legislature amended the law by chapter 42, General Laws of Oregon 1919, ORS 163.270, increasing the penalty for an assault to life imprisonment, it undoubtedly did not have in mind the penalty for the graver offense of rape which carried a sentence of up to 20 years. Otherwise, it would not have created such an absurdity."

203 Or at 632-33. *Cannon* provides a clear rule that the crime of assault with intent to commit a separate crime cannot be punished more severely than the separately intended crime itself. More generally, *Cannon* suggests that the legislature cannot punish an attempt more severely than the completed crime itself.

The limits of *Cannon* were explored—and a different result reached—in *Merrill v. Gladden*, 216 Or 460, 337 P2d 774 (1959), where the court addressed the same issue, but under a different statutory structure. The defendant in *Merrill* was convicted of assault with intent to commit robbery and sentenced to a term of imprisonment of 20 years, the maximum under the pertinent statute. He argued that the penalty for assault with intent to commit robbery was greater than the penalty for robbery itself. The statutes involved, however, were more complicated than his argument suggested. The statute defining robbery with a dangerous weapon provided a penalty of up to life imprisonment; the statute defining robbery without such a weapon provided a penalty of up to 15 years. *Id.* at 462-63. The court accepted that, under *Cannon*, a lesser-included offense should feature a proportionately lesser penalty. In *Merrill*, however, the indictment mentioned that the defendant had used a weapon. Comparing the maximum penalties for assault with intent to commit robbery (20 years) with armed robbery (life), the court concluded that the penalties were proportional.

The only case other than *Cannon* in which this court has concluded that a sentence violated the proportionality provision is *State v. Shumway*, 291 Or 153, 630 P2d 796 (1981), where the court addressed another variant of the question of when a potentially longer sentence for a crime of lesser seriousness may violate the proportionality requirement. The defendant in *Shumway* was convicted of intentional homicide. He was sentenced to life in prison and required to serve 25 years before becoming eligible for parole. However, if the defendant had been convicted of intentional homicide, committed with aggravating circumstances—*i.e.*, a homicide even more serious than one simply committed intentionally—he would have been eligible for parole either 15 or 20 years after sentencing, depending on the nature of the aggravating circumstances. As the court summarized the statutory scheme, "[A] defendant receives a lesser minimum sentence to be served before being eligible for parole for aggravated intentional homicide than he does for an unaggravated intentional homicide." *Id.* at 164. The court concluded that such a disparity violated the proportionality clause of Article I, section 16, of the Oregon Constitution. As a remedy, the court held unconstitutional, as applied to the defendant, the statutory provision requiring him to serve not less than 25 years before becoming eligible for parole, but otherwise upheld his life sentence. *Shumway*, 291 Or at 164.

To summarize, this court's cases do not provide a comprehensive understanding of the scope of Article I, section 16, but they do provide some perspective on certain aspects of the proportionality requirement.[10] The court has used the test of whether the penalty was so disproportioned to the offense as to "shock the moral sense of reasonable people" and ordinarily has deferred to legislative judgments in assigning penalties for particular crimes, requiring only that the legislature's judgments be reasonable. The cases permit the legislature to impose enhanced sentences on recidivists,

---

[10] Although it is not germane to this case, for the sake of completeness we note a textually explicit constitutional exception to the proportionality provision of Article I, section 16. In 1984, the people amended the Oregon Constitution by adding Article I, section 40, which provides death as the penalty for aggravated murder when certain requirements are met. Article I, section 40, provides that the death penalty may be imposed as permitted by that provision "[n]otwithstanding" Article I, sections 15 and 16.

even if those sentences would be disporportionate when applied to a defendant without prior convictions. Finally, the proportionality provision bars the legislature from punishing a lesser-included offense (such as an attempt) more severely than the greater-inclusive offense (such as completion of the attempted crime).[11]

## III

■ With the foregoing understanding of the proportionality requirement of Article I, section 16, we turn to defendant's specific arguments that the sentences imposed on him are unconstitutional. Defendant's arguments include both a facial and an as-applied challenge. To the extent that defendant argues that the criminal statutes that were the basis for his prior convictions and the recidivism statute under which he was sentenced in this case, ORS 137.719(1), permit a sentence that is disproportionate to sentences imposed under other sentencing statutes, his challenge appears to be a facial one. To the extent that defendant focuses on what he characterizes as the limited harm to his victims (in the earlier crimes and in the crimes in this case) in weighing proportionality, the challenge appears to be an as-applied one.

To recapitulate, defendant was convicted in this case of 18 separate sex felonies involving three different boys: 10 counts of first-degree sexual abuse, ORS 163.427, three counts of first-degree sodomy, ORS 163.405, three counts of second-degree sodomy, ORS 163.395, and two counts of using a child in a display of sexually explicit conduct, ORS 163.670. Under the sentencing guidelines, for those crimes alone defendant was subject to mandatory minimum sentences ranging from 70 to 100 months for each of the 18 counts. If

---

[11] We recognize that the legislature has determined that some "attempt" crimes are as serious as the "completed" crime, and therefore has set the same penalty for both. Delivery of a controlled substance, for example, is defined to include not only "actual" delivery but also "attempted" delivery. *See* ORS 475.005(8). Similarly, "robbery" is the same crime whether or not the robber is successful in taking money from the victim. *See* ORS 164.395 (third-degree robbery defined as use or threat of immediate physical force in the course of "committing or attempting to commit theft"). Those crimes, of course, do not raise proportionality concerns under the cases described above because the penalty for the "attempt" crime is the same as, not greater than, the penalty for the "completed crime."

those sentences had been imposed consecutively—and defendant never has claimed that they could not be so imposed—his sentences for the crimes charged in this case would have amounted to 1340 months, or 111.67 years, in prison.

These crimes, however, were not defendant's first offenses. As noted, he previously has been convicted of second-degree sodomy and third-degree sodomy—both felonies—and robbery. Because of his two prior felony sex-crime convictions, defendant was subject to ORS 137.719(1):

> "The presumptive sentence for a sex crime that is a felony is life imprisonment without the possibility of release or parole if the defendant has been sentenced for sex crimes that are felonies at two times prior to the current sentence."

Although the presumptive sentence for each of defendant's 18 convictions was life imprisonment without possibility of release, the trial court had the authority to depart from that sentence "based upon findings of substantial and compelling reasons." ORS 137.719(2). The trial court, however, did not depart from the presumptive sentence described in ORS 137.719(1), and the court sentenced defendant to 18 consecutive sentences of life imprisonment without possibility of release.

■ Defendant makes two arguments that ORS 137.719(1) is facially unconstitutional. He argues that had he committed "the more serious felony of murder," the presumptive sentence would have been life with a 25-year minimum term. That argument, of course, ignores the fact that ORS 137.719(1) is a recidivism statute that applies to defendant only because he has two prior felony convictions for sex crimes. The fact that the presumptive sentence for a murder committed by a defendant with *no prior convictions* is less severe than the presumptive sentence for a felony sex crime committed by a defendant who has been convicted of two prior felony sex crimes does not, in our view, "shock the moral sense of reasonable people." As *Smith* and *Jensen* made clear many years ago, the legislature may protect society from those who cannot or will not conform their behavior to criminal statutes by imposing more severe sentences on repeat offenders. That is what the legislature did by enacting ORS 137.719(1).

Defendant also argues that ORS 137.719(1) is disproportionate compared to other recidivism statutes, asserting that a person with prior convictions of assault, who is again convicted of assault, is likely to receive a sentence less severe than the sentence imposed on defendant here. The legislature, however, has set the presumptive penalty for a felony sex crime, when committed by a person with two prior convictions for such crimes, to be life imprisonment without possibility of parole (unless the trial court decides to impose a lesser sentence). The question is whether that penalty is "proportioned to the offense." We cannot say that it is not. The legislature evidently considered the repeated sex crimes at issue here—whether because sex crime victims often are young and vulnerable to adult coercion, because of the possibility of recidivism by sex offenders, or because of the severity of the impact of such crimes on the victims—to be deserving of a greater presumptive penalty than assault, even an assault by a person with a previous assault conviction. As we noted in *Isom*, even if defendant's opinion of the relative "seriousness" of an assault compared to a sex felony made sense—a proposition that we need not decide—the legislature had a different opinion. *See Isom*, 313 Or at 400 (applying that test). The legislature chose to impose a more serious penalty on the serial sex offender. We cannot say that the legislature was unreasonable in doing so, or that the penalty it established would shock the moral sense of reasonable people.

■ Defendant's "as applied" challenge also fails. Defendant argues that the life sentences without possibility of parole imposed on him under ORS 137.719(1), when compared to the ordinary guidelines sentence of over 111 years that he otherwise would have faced, would "shock" anyone's moral sense. As described above, this court's previous cases have permitted lengthy sentences, including life imprisonment, as a response to recidivism. Defendant also argues that the life sentences imposed on him are unconstitutionally disproportionate because "[t]he felonies did not involve a physical assault and did not involve a permanent physical injury." Sex crimes may or may not result in permanent physical injury, but the legislature is entitled to presume that they are a serious matter in light of the potential for both

physical and psychological injury and that lengthy sentences are necessary to protect the public from further harm by recidivists. *See* Or Const, Art I, § 15 (protection of society is an appropriate goal of criminal punishment).

We therefore hold that, under the test articulated above, defendant's sentences bear a sufficient relationship to the gravity of the crimes of which he was convicted and his prior felony convictions. The sentences do not violate the proportionality clause of Article I, section 16, of the Oregon Constitution.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.