Argued and submitted January 22, 2014, reversed and remanded for resentencing June 17, petitions for review allowed December 10, 2015 (358 Or 449)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DENNIS JAMES DAVIDSON,
*Defendant-Appellant.*

Marion County Circuit Court
11C43121; A150292

353 P3d 2

Ernest G. Lannet, Chief Deputy Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Matthew Preusch, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Jeremy C. Rice, Assistant Attorney General.

Before Hadlock, Presiding Judge, and Sercombe, Judge, and Tookey, Judge.*

SERCOMBE, J.

---

* Sercombe, J., *vice* Armstrong, J.

## SERCOMBE, J.

Certain recidivist sexual offenders are subject to a presumptive sentence of life imprisonment without the possibility of release, a "true life sentence." In particular, under ORS 137.719(1), an offender is subject to a presumptive true life sentence the third time the offender is sentenced for a felony sex crime.[1] Rape, sodomy, and a number of other offenses are felony sex crimes. *See* ORS 181.805(5). Public indecency[2] is a felony sex crime if the offender has a prior conviction for public indecency (or another sex crime). ORS 163.465(2); ORS 181.805(5)(t). Accordingly, upon an offender's fourth sentence for public indecency, the offender is subject to a presumptive true life sentence.

After being convicted of public indecency for public masturbation on three occasions, defendant was convicted of two further public indecency charges and—at the age of 34—was sentenced to two consecutive terms of life in prison without the possibility of release. He contends that his sentence shocks the moral sense of reasonable people and, accordingly, is unconstitutional under the proportionality clause of the Oregon Constitution.[3] The state contends that the life sentence is constitutional because it was imposed, not for any particular public indecency conviction, but for defendant's recidivism and lack of amenability to rehabilitation. Because we agree with defendant that his life sentence is constitutionally disproportionate under the circumstances of this case, we remand the case for resentencing.[4] Before

---

[1] ORS 137.719(1) provides, "The presumptive sentence for a sex crime that is a felony is life imprisonment without the possibility of release or parole if the defendant has been sentenced for sex crimes that are felonies at least two times prior to the current sentence."

[2] "A person commits the crime of public indecency if while in, or in view of, a public place the person performs: * * * [a]n act of exposing the genitals of the person with the intent of arousing the sexual desire of the person or another person." ORS 163.465(1)(c).

[3] Article I, section 16, of the Oregon Constitution provides, in part, that "all penalties shall be proportioned to the offense."

[4] In his first five assignments of error, defendant contends that the trial court erred by declining to give three of his requested jury instructions and by sustaining the state's objection to his closing argument. In his final assignment of error, defendant argues that the trial court erred by instructing the jury that it could return a nonunanimous jury verdict. We summarily reject those assignments of error. In light of our conclusion that defendant's sentence violates Article I,

detailing those circumstances, we set out the standards to determine if a sentence imposed under a sex crime recidivist statute is disproportionate under Article I, section 16, of the Oregon Constitution.[5]

## DISPROPORTIONALITY UNDER ARTICLE I, SECTION 16

As noted, under Article I, section 16, "all penalties shall be proportioned to the offense." Article I, section 16, requires that the penalty imposed on a criminal defendant be proportioned to the specific offense for which the defendant was convicted, or, in other words, that the sentence bear the appropriate comparative relation to the gravity of that particular offense. *State v. Wheeler*, 343 Or 652, 667, 175 P3d 438 (2007) (stating test for an "as-applied" application of Article I, section 16, to a particular penalty). Courts evaluate the proportionality of a penalty by considering whether the imposition of the sentence would shock the moral sense of reasonable people. *Id.* at 668.

Prompted, no doubt, by the difficulty of applying such an amorphous test, the Supreme Court in *State v. Rodriguez/Buck*, 347 Or 46, 58, 217 P3d 659 (2009), fashioned a structured test to assess disproportionality under

---

section 16, we also do not address defendant's challenge to that sentence under the Eighth Amendment to the United States Constitution.

[5] As a preliminary matter, the state contends that we lack authority to review defendant's sentence. The state relies on ORS 138.222(2)(a), which provides that, on appeal of a judgment of conviction for a felony, an appellate court may not review "[a]ny sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission" and on OAR 213-003-0001(16), which defines "[p]resumptive sentence" to include "a sentence designated as a presumptive sentence by statute." Those authorities support a conclusion contrary to the state's position. ORS 138.222(2)(a) prohibits our review of those presumptive sentences *"prescribed by"* rules of the Oregon Criminal Justice Commission. (Emphasis added.) OAR 213-003-0001(16) is indeed a rule of the Oregon Criminal Justice Commission, but it does not "prescribe" the presumptive true life sentence at play here. That presumptive sentence was prescribed by the Legislative Assembly in ORS 137.719, not by the Oregon Criminal Justice Commission in a rule. OAR 213-003-0001(16) merely cross-references a presumptive sentence prescribed by the legislature. ORS 138.222(2)(a) does not make defendant's sentence unreviewable. *See also State ex rel Huddleston v. Sawyer*, 324 Or 597, 605, 932 P2d 1145 (1997) ("presumptive sentence" as used in ORS 138.222(2)(a) refers only to "the sentence provided in a grid block for an offender classified in that grid block by the combined effect of the crime seriousness ranking of the current crime of conviction and the offender's criminal history").

Article I, section 16. There, the court expanded on what kind of relationship between the gravity of a defendant's crimes and criminal history, on the one hand, and a particular punishment, on the other, is constitutionally sufficient to avoid as-applied disproportionality.

In *Rodriguez/Buck*, the court consolidated two cases in which the defendants had been convicted of first-degree sexual abuse. The state assigned error to the trial courts' imposition of sentences of 16- and 17-month terms of incarceration on the defendants, when ORS 137.700 (Measure 11) required a mandatory minimum sentence of 75 months in prison for first-degree sexual abuse. 347 Or at 52. Rodriguez had briefly caused the back of the victim's head to be in contact with Rodriguez's clothed breasts. *Id.* at 70. Buck had allowed the back of his hand to remain when the victim leaned her clothed buttocks against it several times; later, Buck wiped dirt off of the back of the victim's shorts with two swipes of his hand. *Id.* In determining that the sentences were constitutionally disproportionate, the Supreme Court considered three nonexclusive factors: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." *Id.* at 58.

Under the first factor, the court compared the severity of the penalty imposed with the "gravity" of the offenses committed by the defendants. *Id.* at 59, 67. The primary determinant of the severity of the penalty is the amount of time the offender must spend in prison or jail. *Id.* at 60. The gravity of the offense requires consideration of both the statutory definition of the offense—including the range of conduct prohibited by the statute—and the particular defendant's conduct in committing the offense—including where on the range of prohibited conduct the defendant's offense falls. *Id.* at 69. The court noted:

"An as-applied proportionality analysis that considers the facts of an individual defendant's specific criminal conduct is particularly significant when the criminal statute at issue covers a broad range of activity, criminalizing a variety of forms and intensity of conduct. In such a case, a harsh penalty might not, on its face, be disproportionate,

because of the fact that the statute dealt, *inter alia*, with some extreme form of that conduct. However, when a defendant is convicted for engaging in only more minor conduct encompassed within the statute, the defendant may plausibly argue that the mandatory sentence, as applied to the particular facts of his or her case, is unconstitutionally disproportionate."

*Id.* at 61. In making this "range of activity" assessment,

"a court may consider, among other things, the specific circumstances and facts of the defendant's conduct that come within the statutory definition of the offense, as well as other case-specific factors, such as characteristics of the defendant and the victim, the harm to the victim, and the relationship between the defendant and the victim."

*Id.* at 62.

Thus, to determine whether the penalty is proportioned to the gravity of the offense, it is appropriate to consider the gravity of the instant conduct in comparison with other criminal conduct in light of relative harm to victims and society and relative culpability. *Id.* (citing *Solem v. Helm*, 463 US 277, 292-93, 103 S Ct 3001, 77 L Ed 2d 637 (1983)). For example, some crimes are generally considered to be more serious than others (*e.g.*, violent crimes are more serious than nonviolent, stealing one million dollars is more serious than stealing one hundred dollars) and a lesser-included offense should not be punished more severely than the greater offense (*e.g.*, assault with intent to murder is more serious than simple assault). *Id.* (citing *Solem*, 463 US at 292-93). As to the two defendants in *Rodriguez/Buck*, the court concluded that, "[n]ot only does defendants' criminal conduct appear insufficiently grave to justify the mandatory [75-month] sentence, but it also is less severe than the conduct in the vast majority of * * * other reported first-degree sexual abuse cases[.]" *Id.* at 74.

The court then turned to the second factor, under which the court compared the penalty imposed with the penalties for related offenses. *Id.* at 63. "If the penalties for more 'serious' crimes than the crime at issue result in less severe sentences, that is an indication that the challenged penalty may be disproportionate." *Id.* Applying that factor, the court noted that the mandatory minimum sentence for

the defendants' clothed touching of the children at issue was the same as the mandatory minimum sentence for second-degree sodomy, second-degree rape, and second-degree sexual penetration. *Id.* at 75. It concluded that reasonable people would not believe that the defendants' sentences were proportioned to their offenses in light of the other, substantially more egregious conduct that was subject to the same mandatory minimum sentence. *Id.* at 75-76.

Finally, the court considered the defendants' criminal histories. The court noted that the defendants had no prior convictions and that their conduct was qualitatively different from the conduct of defendants in other first-degree sexual abuse cases. *Id.* at 78. "In the more common first-degree sexual abuse cases," the court explained, "the contact is not only far more physically invasive and sexually charged, but it has occurred multiple times, rather than only once." *Id.* After examining all three of those factors, and concluding that each indicated that the defendants' sentences were disproportionate, the Supreme Court concluded that the sentences in those cases violated Article I, section 16.

This case involves the application of *Rodriguez/Buck* and Article I, section 16, to a sentence imposed for several crimes under the current sexual offender recidivism statute. The Supreme Court has addressed the application of Article I, section 16, to a previous version of the sexual offender recidivism statute, which provided for an indeterminate life sentence (with the possibility of release), on several occasions, including as applied to an offender convicted of indecent exposure (but also of another sex crime). The court has also addressed ORS 137.719(1), as applied to an offender convicted of sexual abuse, sodomy, and other crimes—but not public indecency—holding that the sentence in that case was not disproportionate. And we have also addressed ORS 137.719(1), but not in the context of serial convictions for public indecency.

In *State v. Waterhouse*, 209 Or 424, 439, 307 P2d 327 (1957), the Supreme Court suggested that—as applied to persons twice convicted of "peeping Tom" crimes or indecent exposure—application of even an indeterminate life imprisonment sentence might be overly severe: "Consideration of the extreme severity of the penalty in its relation to

the gravity of such offenses may suggest to the legislative assembly the advisability of ameliorating amendments."[6] In other words, the court questioned the severity of a sentence imposed on a recidivist with fewer public indecency convictions than required under the current scheme.

On the other hand, in *Jensen v. Gladden*, 231 Or 141, 372 P2d 183 (1962), the Supreme Court held that an indeterminate life sentence that had been imposed on a recidivist sexual offender did not violate Article I, section 16. The petitioner had previously been convicted of contributing to the delinquency of a minor. About two years later, while on parole, the petitioner was convicted of indecent exposure. The sexual offender statute in effect at the time— *former* ORS 167.050 (1985), *repealed by* Or Laws 1971, ch 743, § 432—listed several offenses (including contributing to the delinquency of a minor and indecent exposure) and provided that a person who committed one of the listed sexual offenses and had previously been convicted of one of those offenses was subject to a sentence of life imprisonment. Under the sentencing scheme in effect at that time, the sentencing judge would set an indeterminate prison term not exceeding the statutory maximum, and the parole board would then determine the amount of time defendant actually spent in prison. *See generally State ex rel Engweiler v. Felton*, 350 Or 592, 598, 260 P3d 448 (2011) (describing difference between "matrix" and determinate sentencing schemes).

In *Jensen*, the trial court imposed the maximum statutory indeterminate sentence of life imprisonment. On appeal, the petitioner argued that the crime of indecent exposure, even when coupled with the previous crime of contributing to the delinquency of a minor, was not sufficiently grave to warrant imposition of a sentence that could result in the petitioner's imprisonment for life and, accordingly, his sentence violated Article I, section 16.

---

[6] In *Waterhouse*, the defendant had previously been convicted of rape and was later convicted of "interfering with the privacy of another." *Former* ORS 167.165 (1953), *repealed by* Or Laws 1963, ch 340, § 1. The defendant had demurred to the indictment, and the state appealed. The court was not called upon in that case to address whether sentencing the defendant under the sexual recidivist statute would be disproportionate.

Whether an indeterminate life sentence, under the circumstances, would shock the conscience, the court stated, would "depend upon the seriousness of repetitive sexual conduct of this kind and the danger that it forecasts for others unless the [petitioner] is segregated from society." *Jensen,* 231 Or at 144-45. However, the court noted that little was known about the causes and cures of sexual offenses. Nonetheless, the court acknowledged that some held the view that "sex offenders tend to progress from minor to major crimes. And there is a belief that all sex offenders tend to be recidivists." *Id.* at 145. Although it cited expert opinion to the contrary, the court opined that the legislature could have had those or similar considerations in mind when it enacted *former* ORS 167.050. *Id.* Moreover, the court observed that the legislation containing *former* ORS 167.050 also afforded those sentenced under it to a periodic parole board review, including consideration of a recent psychiatric examination. *Id.* at 146. The court noted:

"Undoubtedly this legislation was influenced by the movement then under way which proposed that sex law offenders be incarcerated for an indeterminate time so *as to measure their imprisonment in accordance with the time that it was necessary to effect psychiatric rehabilitation.*"

*Id.* at 146-47 (emphasis added). Thus, although the court upheld a life sentence imposed upon a recidivist sexual offender whose crimes included public indecency, the court tied the need for an indefinite and sometimes lengthy sentence to the possibility of reformation and release.

Only a year after *Jensen,* the court upheld a true life sentence imposed on a recidivist offender who had been convicted of burglary not in a dwelling and, previously, of three other unspecified felonies. *Tuel v. Gladden,* 234 Or 1, 379 P2d 553 (1963).[7] In reaching its conclusion, the court

---

[7] The offender's challenge in *Tuel* appears to have been based, at least primarily, on Article I, section 15, of the Oregon Constitution (which at the time required that punishments be founded on principles of reformation and not vindictive justice). Although the *Tuel* court mentioned Article I, section 16, in its discussion, it is not entirely clear that the court did more than conclude that the sentence at issue did not violate Article I, section 15. We nonetheless have cited *Tuel* for the proposition that the Supreme Court has upheld a true life sentence against an Article I, section 16, challenge. *State v. Kinkel,* 184 Or App 277, 291, 56 P3d 463, *rev den,* 335 Or 142 (2002).

opined, "If the criminal is a menace to the community, his sentence should be aimed at offering the most protection to the community, regardless of the relative innocuousness of the particular crime for which he is now convicted." *Id.* at 6. The court further observed that, if previous efforts at reformation had failed, it is more likely that an offender will continue to be dangerous and will not respond to additional reformation attempts. *Id.* at 6-7.

Both we and the Supreme Court have considered true life sentences imposed under the current sexual offender recidivism statute and concluded that they were not constitutionally disproportionate. *Wheeler,* 343 Or 652; *State v. Meyrovich,* 204 Or App 385, 129 P3d 729, *rev den,* 340 Or 673 (2006). In *Meyrovich,* the defendant had previously been convicted of nine prior sex offenses. After he gained access to the victim's house and then forcibly kissed her on the neck, he was convicted of first-degree burglary and first-degree sexual abuse, and sentenced to true life under ORS 137.719(1). *Id.* at 387. Applying the "shock the moral sense" standard, we rejected the defendant's disproportionality challenge. The defendant's focus on the "assertedly innocuous" conduct in the instant case missed the point, we explained, because ORS 137.719(1) emphasizes not the gravity of a particular offense but "the fact that the offender is a habitual sex criminal." *Id.* at 393. The defendant's criminal history included nine prior sex offenses involving minor victims, weapons, and use of force, and he had never acknowledged culpability for the first-degree burglary and first-degree sexual abuse. In light of that history, we concluded that a life sentence was not unconstitutionally disproportionate.

In *Wheeler,* the defendant had previously been convicted of second-degree sodomy and third-degree sodomy—both felonies—and robbery. The defendant was then convicted of 18 criminal charges—including sexual abuse, sodomy, and using a child in a display of sexually explicit conduct—based on conduct involving three boys between the ages of nine and 15. The trial court, applying ORS 137.719(1), imposed a presumptive true life sentence on each of the 18 charges, to run consecutively. 343 Or at 654.

On review, the defendant argued that ORS 137.719(1) was unconstitutional both on its face and as applied to him. After examining the history of proportionality requirements generally and Article I, section 16, the Supreme Court observed that the Oregon framers' concern was "that the penalty imposed on a criminal defendant be 'proportioned' to the specific offense for which the defendant was convicted—that it bear the appropriate 'comparative relation' to the severity of that crime." 343 Or at 667. The court then reviewed its previous cases interpreting Article I, section 16, and gleaned the following principles:

> "The court has used the test of whether the penalty was so disproportioned to the offense as to 'shock the moral sense of reasonable people' and ordinarily has deferred to legislative judgments in assigning penalties for crimes, requiring only that the legislature's judgments be reasonable.[8] The cases permit the legislature to impose enhanced sentences on recidivists, even if those sentences would be disproportionate when applied to a defendant without prior convictions."

*Id.* at 676-77.

In a brief discussion, the court applied those principles to the defendant's case. The court first rejected the defendant's facial challenge, noting that it could not say that the legislature had acted unreasonably in punishing recidivists more harshly than those convicted of single, arguably more serious offenses or in punishing sexual recidivists more harshly than nonsexual assault recidivists. *Id.* at 679. The defendant alternatively argued that a true life sentence was unconstitutionally disproportionate as applied to him (1) when compared with the 111-year sentence he would otherwise have received and (2) because his offenses did not

---

[8] In *State v. Alwinger*, 236 Or App 240, 243, 236 P3d 755 (2010), we opined that the Supreme Court, in *Rodriguez/Buck*, "appears to have abandoned the 'arguably rational basis' test described in *Wheeler*." We note however that *Rodriguez/Buck* involved an as-applied challenge, the essence of the requirement of proportionality in Article I, section 16, between a specific offense and the penalties for that offense. The "arguably rational basis" test, one of minimum judicial scrutiny, has continuing vitality only when evaluating facial disproportionality and related equal protection/equal privileges and immunities challenges to criminal penalty classifications under Article I, section 20, of the Oregon Constitution and the Fourteenth Amendment to the United States Constitution.

involve physical assault or permanent physical injury. The court rejected that challenge as well, concluding that the "defendant's sentences bear a sufficient relationship to the gravity of the crimes of which he was convicted and his prior felony convictions." *Id.* at 680.

To summarize, the Supreme Court has suggested that even an indeterminate life sentence imposed after two convictions for public indecency might be overly severe (*Waterhouse*). On the other hand, the court has upheld indeterminate life sentences imposed on recidivist offenders whose crimes might reasonably be described as relatively low-level: contributing to the delinquency of a minor and, previously, of public indecency (*Jensen*) and burglary (*Tuel*—although it is hard to make too much of *Tuel* as the prior offenses were not described). More recent recidivist cases have involved more serious conduct, criminal history, or both (*Meyrovich*—nine prior sexual offenses involving minors, weapons, and force; *Wheeler*—18 offenses involving children as young as nine). As noted, no reported case applying ORS 137.719(1) has involved public indecency as a predicate offense. Finally, in *Rodriguez/Buck*, the court identified several factors that bear upon whether the sentence in a particular case would shock the conscience of reasonable people.

We apply those factors here, modified to reflect the principle that a penalty that might be proportional for a repeat offender would not necessarily be proportional for a first-time offender. *E.g., Rodriguez/Buck*, 347 Or at 65-66 (observing that the "idea that a penalty that might be proportional as applied to one who has previously committed the same or other crimes but not proportional as applied to a first-time offender" is rooted in Blackstone); *Wheeler*, 343 Or at 671 ("The cases * * * establish that the proportionality provision permits the imposition of penalties for repeat offenders that might not be permissible for a single offense."); *Jensen*, 231 Or at 145 (whether indeterminate life sentence proportional depended on "seriousness of repetitive conduct of this kind and the danger that it forecasts for others unless the defendant is segregated from society").

## DEFENDANT'S CONDUCT

Defendant was sentenced to true life sentences for his fourth and fifth convictions for public indecency. The first incident occurred in July 2006. Before the date of that incident, defendant had lived with his grandmother, and she or someone else who lived in her house had caught defendant masturbating while looking out the window at a nearby house where a young woman, A, lived. On July 21, a neighbor who lived in another house observed defendant masturbating on the porch of A's house and called the police. The neighbor reported that, when defendant saw her, he started thrusting his hips in her direction and yelled, "You want some of this?" When the police arrived and questioned defendant, he denied masturbating. Instead, defendant told police that he knew A, he had just been in her house where they had masturbated together, and the neighbor saw him zipping up his pants after he left that encounter. Defendant described A's room, including her sheets. Police searched defendant and his backpack, and discovered a bottle of KY liquid lubricant, a knee-high nylon stocking, methamphetamine and marijuana paraphernalia, and a letter referring to A that said, "I've got a crush on you so bad it's frustrating." A denied knowing defendant but confirmed that his description of her room and sheets was correct. A subsequently applied for and received a stalking protective order against defendant. Defendant was convicted of public indecency and sentenced to 18 months' probation.

On September 1, 2006, while on probation for the first public indecency incident, defendant committed public indecency a second time. In this second incident, an elementary school principal reported that defendant was masturbating on the school playground about 200 feet from where children were playing. Defendant was observed masturbating by the principal, three children, a school custodian, and the school kitchen manager. The children reported that defendant was watching them play. The kitchen manager reported that she was inside and saw defendant through a window; when defendant noticed her, he turned more toward the window. Upon conviction for public indecency, defendant was sentenced to 28 months' incarceration and a term of post-prison supervision.

Defendant was released from incarceration for the second incident on August 21, 2008. Thereafter, he was jailed for probation violations from September 1 to 8 and from October 5 to November 5. On November 6, defendant admitted to his probation officer that he had walked by A's residence and had "glanced" at her house. He was jailed for 30 days for that probation violation.

Then, on December 16, 2008, defendant committed public indecency a third time. Defendant had visited a pornography store in a strip mall that also contains a thrift store. While in the pornography store, defendant watched movies and masturbated. When he left the store, he "was trying to find a date." In the parking lot, he saw three women (who were accompanied by a two-year-old child). Defendant exposed his penis and started masturbating. One of the women reported that, when he looked at her, he began stroking his penis with two hands; defendant turned away and then turned back toward them. Defendant explained that he believed that seeing him masturbate would make the women "hot" and want to date him.[9] Upon this conviction, defendant was again sentenced to 28 months' incarceration and a term of post-prison supervision.

Finally, four days after his release for the third conviction, the incidents leading to the charges in this case occurred. On April 17, 2011, a woman, Davis—while picnicking in a park with her mother and three girls ages 3, 10, and 12—observed defendant masturbating behind a tree. Davis testified that defendant saw her looking at him. Davis called 9-1-1 "in a panic." While Davis was on the phone with a 9-1-1 operator, she gathered her family with the intention of returning to her car. Also while she was on the phone, defendant walked by her, shaking his hand as if to dry it. Davis testified that she was scared during this incident. Defendant said, "I'm leaving," then jumped a fence and walked between two neighboring houses. When police located defendant shortly afterward, he was standing outside the park fence, looking into the park, masturbating.

---

[9] Defendant was also charged with additional counts of public indecency for conduct earlier that day inside the pornography store related to a woman that defendant believed to be a prostitute. Those charges were later dismissed.

Defendant was charged with public indecency for both incidents of masturbation.

Imprisonment does not check defendant's inclination to masturbate in front of others. In June 2010, a corrections officer observed him masturbating. On April 17, 2011—the date he was arrested for the fourth and fifth public indecency incidents—an officer at the Marion County Jail reported:

"While in Intake, I caught [defendant] masturbating in Holding Cell #2 as well as the bathroom in the Intake Dayroom. Nurse Cecile came to see [defendant] for some medical attention and shortly after he was caught masturbating in the bathroom. I asked [defendant] why he was masturbating again, and he said it was because 'I saw the nurse.' He continued to ask when she would be back to see him again. [Defendant] stated that he likes females."

Defendant fails to appreciate the illegality and harmful effects of his public masturbation, and he does not comprehend or respect the restrictions placed on him as a result of his misconduct. When defendant was released from prison for the second incident in August 2008, his intake parole officer reported the following:

"Client informed me * * * he had about 30 girlfriends prior to going to prison and asked if it was ok for him to have sex with them since he already knew them. * * * Client informed this officer he greets his friends by hugging and kissing them and asked if this was ok. * * * Client kept asking similar questions regarding sex issues, trying to find a loophole."

Later parole officer reports reflect that defendant "continued to find ways to get around his conditions of Post-Prison Supervision as evidenced by continual questions about no contact with minors or being near elementary schools." As noted above, in November 2008, he admitted that he had walked by A's house. In this case—after being convicted of public indecency three previous times—when police officers approached defendant and told him that witnesses had seen him touching his genitals in the park, defendant replied, "Is that illegal or something?" During transport to the jail,

defendant denied being aware that he was not allowed in places where minors congregate. At sentencing, defendant addressed the court:

> "I just wanted to say it was summertime. You know, I was in my backyard at this school—the school incident. And there was no children * * * in the summertime. * * * [I]t was like my birthday, and I was drunk, and I just got out of jail, and I just got undone. I didn't mean to cause nobody no harm. I didn't try to rape. I didn't try to hurt nobody. I just wanted to say that I didn't mean to cause a sex offense, or anything. I didn't try to show her. I guess my pants was—fell down or something because it was summer—it was summer, and I drank some wine, and stuff, and I was sitting down, and I guess my pants fell down, or something. * * *
>
> "* * * * *
>
> "* * * Oh, and the jail incident wasn't like a prior—I had like a rash—I was putting the rash stuff on[.]"

Bluntly, defendant has demonstrated the following pattern: masturbate in public, get locked up (and continue to masturbate in front of others), get released, and—within days—masturbate in public again. Defendant is not remorseful; in fact, it seems that he may not even understand—despite having been convicted several times—that public masturbation is illegal.[10] Given that pattern and state of mind, it is reasonable to expect that, if defendant is released, he will reoffend. As his own lawyer puts it, defendant is "an incorrigible masturbator."

---

[10] Defendant has cognitive problems that may contribute to his lack of understanding. When defendant was 16 or 17, a friend hit him in the head with a baseball bat. He suffered a serious eye injury, and his left eye eventually had to be removed. Defendant underwent several years of physical and mental rehabilitation following this injury. According to defendant, after his injury, he began daily use of "just about every drug he could get his hands on, with a particular affinity for daily IV methamphetamine and marijuana use." In 2009, defendant was diagnosed with a cognitive disorder due to his traumatic brain injury, as well as alcohol and amphetamine dependence and an unspecified personality disorder. The report of defendant's 2009 mental health evaluation states:

"He has obviously distorted sexual attitudes and opinions, believing that women might be attracted to him and by masturbating in public in their presence. It is particularly worrisome that this behavior has apparently extended to include prepubescent children. * * * He does not believe that he has any sexual problem and that this behavior was justifiable or just not that significant."

## FACTOR ONE: A COMPARISON OF THE SEVERITY OF THE PENALTY AND THE GRAVITY OF THE OFFENSES

The first *Rodriguez/Buck* factor is a comparison of the severity of the penalty and the gravity of the offense. In this case, establishing the severity of the penalty is straightforward. Life imprisonment without the possibility of parole is the most severe penalty that can be imposed aside from death. As to the gravity of the offense, however, applying the first *Rodriguez/Buck* factor here is somewhat more complicated. That is so because, as the state posits, the penalty under ORS 137.719(1) is triggered not by the instant offenses but by those offenses in light of a defendant's recidivism. As the court explained in *Rodriguez/Buck*, this factor requires us to consider both the range of conduct prohibited by the statute defining the offense and the particular conduct of the defendant in committing the offense. 347 Or at 69. We think, in the circumstances of a recidivist statute, it is appropriate to consider both the range of conduct potentially subject to a true life sentence under ORS 137.719(1) (that is, what combination of offenses would trigger a true life sentence) and defendant's particular conduct in committing all of the predicate offenses.

ORS 137.719(1) provides:

"The presumptive sentence for a sex crime that is a felony is life imprisonment without the possibility of release or parole if the defendant has been sentenced for sex crimes that are felonies at least two times prior to the current sentence."

"Sex crime" is defined in ORS 181.805(5), in part, to include the following crimes that are always or sometimes felonies:

"(a)  Rape in any degree;

"(b)  Sodomy in any degree;

"(c)  Unlawful sexual penetration in any degree;

"(d)  Sexual abuse in any degree;

"(e)  Incest with a child victim;

"(f)  Using a child in a display of sexually explicit conduct;

"(g)   Encouraging child sexual abuse in any degree;

"* * * * *

"(j)   Compelling prostitution;

"(k)   Promoting prostitution;

"(l)   Kidnapping in the first degree if the victim was under 18 years of age;

"* * * * *

"(o)   Possession of materials depicting sexually explicit conduct of a child in the first degree;

"(p)   Kidnapping in the second degree if the victim was under 18 years of age[;]

"(q)   Online sexual corruption of a child in any degree if the offender reasonably believed the child to be more than five years younger than the offender;

"(r)   Luring a minor, if:

"(A)   The offender reasonably believed the child to be more than five years younger than the offender or under 16 years of age; and

"(B)   The court designates in the judgment that the offense is a sex crime;

"* * * * *

"(t)   Public indecency or private indecency, if the person has a prior conviction for a crime listed in this subsection;

"(u)   Trafficking in persons as described in ORS 163.266(1)(b) or (c);

"(v)   Purchasing sex with a minor if the court designates the offense as a sex crime pursuant to ORS 163.413(3)(d), or the offense is the defendant's second or subsequent conviction under ORS 163.413(3)(b)(B);

"(w)   Any attempt to commit any of the crimes listed in paragraphs (a) to (s), (u) or (v) of this subsection;

"(x)   Burglary, when committed with intent to commit any of the offenses listed in paragraphs (a) to (v) of this subsection;

"(y)   Criminal conspiracy if the offender agrees with one or more persons to engage in or cause the performance of an offense listed in paragraphs (a) to (t) of this subsection."

Thus, a myriad combination of offenses may lead to a true life sentence under ORS 137.719(1). We have no hesitation in observing that ORS 137.719(1) subjects a broad range of conduct to a true life sentence. In fact, ORS 137.719(1) is similar, in its context, to ORS 163.427(1)—the statute defining first-degree sexual abuse that the Supreme Court considered in *Rodriguez/Buck*. In *Rodriguez/Buck*, the court observed that "few statutes [aside from ORS 163.427(1)] criminalize such a broad range of conduct." 347 Or at 69. Here, few statutes make such a broad swath of conduct subject to the same penalty, let alone such a severe penalty. Under ORS 137.719(1), the following offenders are subject to an identical presumptive penalty: an offender who has committed multiple counts of first-degree rape or sodomy—offenses that can involve some of the most serious acts of violence, force, and intimate violation imaginable; an offender who has committed multiple offenses that involve subjecting children to sexual conduct, including child incest, child-pornography offenses, or purchasing sex with a child; and a defendant who exposes his genitals for the purpose of sexual arousal in a public place as few as four times, even if he is observed only by adults at a distance. The group of four public indecency crimes that defendant committed are comparatively less serious than a grouping of other sex crimes—which largely involve crimes against children, violent acts, or prohibited or nonconsensual sexual touching—for which a true life sentence might be imposed under ORS 137.719(1).[11] Thus, similarly to *Rodriguez/Buck*, because ORS 137.719(1) encompasses conduct that reasonable people

---

[11] Comparatively, the crime of felony public indecency is not a "major felony sex crime" for which a mandatory minimum sentence of 25 years must be imposed for the second conviction, ORS 137.690, or a crime that subjects an offender to a mandatory minimum sentence under ORS 137.700 (Measure 11). It is in a group of sex crimes that are subject to ORS 137.719(1) and that are categorized under OAR 213-017-0006 as crime category 6 on the Crime Seriousness Scale (together with rape in the third degree, sodomy in the third degree, online sexual corruption of a child in the second degree, possession of material depicting sexually explicit conduct of a child, and luring a minor). Nearly all of the remaining sex crimes that are subject to ORS 137.719(1) are classified as more serious crime categories 7, 8, 9, or 10, OAR 213-017-0002 to 213-017-0005 (including rape in the first or second degree, sodomy in the first or second degree, unlawful sexual penetration in the first or second degree, sexual abuse in the first or second degree, using a child in a display of sexual conduct, encouraging child sex abuse, compelling or promoting prostitution, and online sexual corruption of a child in the first degree).

would consider extremely harmful and conduct that reasonable people would consider far less harmful, defendant is entitled to argue that applying a true life sentence to him is unconstitutionally disproportionate. 347 Or at 69-70.

We turn to the second part of the first *Rodriguez/Buck* factor, the specific conduct in which defendant engaged. Again, because we are considering a recidivist statute, we consider defendant's specific conduct in all four of the predicate offenses, as compared with other specific conduct that could trigger a true life sentence under ORS 137.719(1). As the Supreme Court observed in *Rodriguez/Buck* in making its assessment under the first factor, we may consider the facts of defendant's conduct that came within the statutory offense of public indecency and case-specific factors relating to the nature of the victims and the harm that they suffered.

Of the four incidents leading to defendant's public indecency convictions, the first incident is perhaps the most troubling. In that incident, defendant was caught masturbating on the porch of his young neighbor, A. He had previously been observed masturbating in his room while looking at A's house, he had written A a note that said "I've got a crush on you so bad it's frustrating," and he could accurately describe A's room down to her sheets. A, however, denied knowing defendant and was so troubled by his conduct that she obtained a stalking protective order. The state represented at sentencing that A was so concerned about defendant's behavior that she continued to be in touch with the district attorney five years later and attended the first day of defendant's trial in this case. Moreover, two years after the incident, defendant admitted to violating the terms of his probation by walking by A's house and "glancing" at it. In short, this first incident reflects the more troubling kinds of circumstances that can be involved in public indecency: direction at a particular victim, an alarming fixation on and knowledge about that victim, continuing interest in the victim, and demonstrated distress in the victim, as evidenced by her obtaining a stalking protective order and her long-term cooperation with the district attorney.

The second, third, and fourth incidents seem more benign in some ways, but more troubling in others. They

seem more benign because there is no evidence that defendant targeted specific, known victims. He simply masturbated in front of whoever happened to be present. On the other hand, all three later incidents affected multiple victims, including children. Two were in places where children can be expected to gather (and, in fact, were gathered): a school and a park. That suggests that defendant intended to have children view his masturbation, and reasonable people would be more concerned about children being exposed to this conduct than adults. In the third incident—in the thrift store parking lot—however, the presence of a child did not seem to be a motivating factor in defendant's conduct.

There is limited evidence in this record of the effect of defendant's conduct on his victims, aside from A. Davis testified that she was scared by defendant's conduct, and it prompted her to try to gather her family and return to her car. In addition, however, in several incidents, defendant went beyond exposing his penis and masturbating in view of others; he engaged in conduct that could reasonably be viewed as more threatening. In the first incident, when observed by the other neighbor, he thrust his hips in her direction and yelled, "You want some of this?" In the incident at the school and the incident in the thrift store parking lot, defendant turned toward victims when he realized that they were observing him.

Overall, in our view, defendant's behavior falls toward the grave end of the scale of conduct that constitutes public masturbation. Especially as to A, defendant's behavior indicates a fixation that she legitimately viewed as alarming. In addition, public masturbation in front of children raises serious concerns about particularly vulnerable victims. And, finally, reasonable people could consider a public masturbator who yells at or turns toward his victims as more alarming than one who tries to hide his behavior when he is discovered.

But we are not considering defendant's behavior only on the scale of conduct that constitutes public masturbation. We are considering his behavior on the scale of conduct subject to a true life sentence under ORS 317.719(1). *See Rodriguez/Buck*, 347 Or at 71 (comparing the defendants'

conduct with other conduct that could be prosecuted as first-degree sexual abuse). Even the most grave multiple incidents of public masturbation, without any evidence of other sexual offenses or physical force or compulsion, pale in comparison with other combinations of incidents that are subject to a true life sentence under ORS 317.719(1). Previous cases applying ORS 317.719(1) are illustrative. In *Meyrovich*, the defendant's behavior included nine prior sex offenses involving minor victims, weapons, and use of force, as well as an incident in which he gained access to a victim's home, began to forcibly kiss her, and desisted only when interrupted by a neighbor. 204 Or App at 388, 393. And in *Wheeler*, the defendant's behavior included more than 20 convictions, including sexual abuse and sodomy; 18 of those convictions involved sexual conduct with three boys aged nine to 15. 343 Or at 654. The harm inflicted by the recidivist conduct in *Meyrovich* and *Wheeler* is orders of magnitude more egregious than the harm inflicted by defendant here. In light of the disparate gravity of behavior, subjecting recidivist public indecency like defendant's to the same extraordinarily severe punishment as applied to conduct like that in *Meyrovich* and *Wheeler* would seem constitutionally disproportionate.

Finally, under the first *Rodriguez/Buck* factor, we consider how defendant would have been punished were felony public indecency not a predicate offense under ORS 317.719(1). *See* 347 Or at 73. If that were the case, defendant would have been classified as follows in this case: For the first public indecency count, defendant would have been classified at 6B in the sentencing grid block, which carries a presumptive sentence of 19 to 24 months in prison. For the second public indecency count, he would have been classified at 6A, which carries a presumptive sentence of 25 to 30 months. If he were sentenced to the maximum and given the maximum upward durational departure for each count under OAR 213-008-0003(2), and the sentences were imposed consecutively, the sentence would have been 108 months, or nine years. In *Rodriguez/Buck*, the court found it constitutionally significant that the Measure 11 sentence was more than twice as long as the guidelines sentence. 347 Or at 73. A similar comparison is even more stark in this

case. Given that defendant was 34 when he was convicted, and assuming that he will live until at least age 70, he will be incarcerated for at least 36 years, or four times the guidelines sentence.

In sum, application of the first *Rodriguez/Buck* factor—a comparison of the severity of the penalty imposed with the gravity of the offenses committed by defendant—suggests that defendant's true life sentence is disproportionate to his recidivist conduct.

### FACTOR TWO: A COMPARISON OF THE PENALTY IMPOSED WITH PENALTIES FOR RELATED OFFENSES

We turn to the second *Rodriguez/Buck* factor—comparison of the penalty imposed with the penalties for related offenses. We find it particularly helpful to consider other sex crimes that do not subject recidivists to a true life sentence.

We set out above the "sex crimes" listed in ORS 181.805(5) that, if classified as a felony, trigger the application of ORS 137.719(1). 271 Or App at 735-36. By contrast, there are sex crimes that are misdemeanors and, for that reason, never trigger the application of ORS 137.719(1). Those sex crimes include third-degree sexual abuse (ORS 163.415(2)), third-degree encouraging child sexual abuse (ORS 163.687(2)), contributing to the sexual delinquency of a minor (ORS 163.435(2)), and sexual misconduct (ORS 163.445(2)). In addition, as defendant observes, there are other felony sexual offenses that are not mentioned in ORS 181.805(5) and, for that reason, never trigger the application of ORS 317.719(1). Those sexual offenses are first-degree custodial sexual misconduct (ORS 163.452) and unlawful contact with a child (ORS 163.479).

Thus, there are at least seven sexual offenses that do not trigger a possible true life sentence when committed by a sexual offense recidivist. Unlawful contact with a child provides an illuminating example. ORS 163.479 provides:

"(1) A person commits the crime of unlawful contact with a child if the person:

"(a)(A)   Has been designated a sexually violent danger-
ous offender under ORS 137.765; [and]

"\* \* \* \* \*

"(b)   Knowingly contacts a child with the intent to com-
mit a crime or for the purpose of arousing or satisfying the
sexual desires of the person or another person."

Under ORS 137.765(1)(b), a sexually violent dangerous
offender is

"a person who has psychopathic personality features, sex-
ually deviant arousal patterns or interests and a history
of sexual assault and presents a substantial probability of
committing a crime [including first-degree rape or first-
degree sodomy using forcible compulsion or of a victim
under 12 years of age]."

A "[h]istory of sexual assault" means that, in a separate
criminal episode, the offender "[s]eriously endangered the
life or safety of another person or involved a victim under
12 years of age[.]" ORS 137.765(1)(a). Thus, if an offender,
in separate criminal episodes, commits (1) forcible rape of
an adult, (2) forcible rape of a child, and (3) unlawful con-
tact with a child by contacting a child with the intent of
arousing the offender's sexual desire, that offender would
not be subject to a true life sentence. That a related, much
more serious and harmful combination of offenses is sub-
ject to a less severe penalty than that imposed on defendant
further suggests that subjecting defendant to true life is
disproportionate.

Third-degree sexual abuse, defined in ORS 163.415,
is also illustrative. Under that statute, a person commits
third-degree sexual abuse by, among other things, subject-
ing a child between 14 and 18 years of age or an uncon-
senting adult to sexual contact. As noted, an offender may
engage in multiple episodes of third-degree sexual abuse
and not be subject to a true life sentence. In other words, had
defendant, instead of masturbating, separately approached
several adult women in public and groped their breasts or
genitals, he would be subject to a less severe penalty than
for four convictions of public indecency. Reasonable people
would agree that serial groping of that nature is at least
as harmful as serial public indecency, and the disparity of

punishments for the combinations of offenses supports a conclusion of disproportionality.

Finally, we note that the penalties for the commission of the most serious crimes by a defendant with an extensive criminal history are much less severe than the true life sentence received by defendant. Under the Oregon sentencing guidelines grid, the presumptive sentence for a crime with a seriousness rating of 11 (murder), OAR 213-017-0001, when committed by an offender with a criminal history of A (three or more person felonies) is 225 to 269 months, much less than the 36 years (432 months) that defendant will be incarcerated if he lives to age 70.[12] The presumptive sentence for a crime with a crime seriousness rating of 10 (attempted aggravated murder and several first-degree crimes: manslaughter, assault, kidnapping, rape, sodomy, sexual penetration, and arson) when committed by an offender with a criminal history of three or more person felonies is 121 to 130 months. Again, the sentence for much more serious crimes by a recidivist offender is less than the true life sentence for defendant. That consideration also suggests disproportionality.

### FACTOR THREE: DEFENDANT'S CRIMINAL HISTORY

Finally, we address the third *Rodriguez/Buck* factor: defendant's criminal history. As the court explained:

"[Inquiry into a defendant's criminal history] is relevant * * * because a defendant who previously has been convicted of and served sentences for other crimes has demonstrated, by committing additional crimes, that the previously imposed sentences were insufficient to prevent the defendant from returning to his or her criminal behavior."

347 Or at 77 (citation omitted). Here, part of defendant's recidivist conduct has already been considered as part of the factor one analysis. We earlier concluded that the true life sentence seemed disproportionate to defendant's particular conduct in committing five public indecency offenses. What

---

[12] That presumptive sentence can be doubled to 450 to 538 months by applying the greatest durational departure allowed by the guidelines under OAR 213-008-0003(2).

remains relevant, however, is defendant's criminal conduct apart from those offenses. In considering criminal history for this purpose, a court should consider "previous criminal convictions and whether there is evidence of multiple instances of uncharged wrongful conduct." *Id.* at 78; *see also Weems/Roberts v. Board of Parole*, 347 Or 586, 602, 227 P3d 671 (2010) ("Criminal history, even of arrests and unadjudicated charges, certainly is relevant in attempting to assess the nature and kind of risks that particular offenders pose for the future."). With that standard in mind, we summarize defendant's criminal history as set out in the presentence investigation report and as discussed before the trial court at sentencing.

Defendant has been in trouble with the law since 1987, when, at age 10, he stole a toy from Fred Meyer. Since then, he has had a total of 48 contacts with law enforcement in Marion County, as well as several arrests and convictions in Florida, where he lived for several years. Aside from public indecency, his misconduct falls into roughly three categories: (1) drugs, (2) personal violence, including domestic violence, and (3) trespass.[13] As to drugs, between 1999 and 2005, he was convicted of possession four times and delivery once. Defendant has a long history of altercations. At age 14, he was in a fight at school, resulting in charges of racial intimidation and fourth-degree assault that were informally adjudicated. As an adult, defendant has been charged with battery (1999), aggravated battery (2001), resisting arrest (2003), and disorderly conduct (twice in 2006: once after a fight and the second time in connection with a public indecency incident). Both battery charges stemmed from incidents of domestic violence: In the first, defendant grabbed the victim by the neck and threw her to the ground. In the second, defendant knew that the victim was two months pregnant; he pushed her twice and, when she pushed him back, said, "Do it again, and I'll beat the shit out of you." He was convicted of trespass once (2003). He also has been arrested for or charged with trespass four additional times (once in 2005 and three times in 2006). Some of the trespass

---

[13] Defendant also has been convicted once of driving while suspended. He has been held in contempt of court at least three times. He has violated probation and post-prison supervision numerous times.

incidents are connected with defendant's public indecency convictions, which we described earlier. Apart from the public indecency convictions, defendant was convicted as an adult of criminal trespass and possession of controlled substances offenses. Although defendant has a long history of trouble with the law, his criminal history does not involve sexual offenses, conduct with sexual overtones, or sexual behavior involving forcible compulsion. Thus, the application of factor three of the *Rodriguez/Buck* test points to a conclusion of disproportionality.

## CONCLUSION

In sum, after considering all of the factors that the Supreme Court identified in *Rodriguez/Buck* in the context of this recidivist statute, we conclude that a true life sentence is unconstitutionally disproportionate as applied to defendant. We do not suggest that no offender who simply repeats the same sexual offense could be constitutionally subjected to a true life sentence. For example, far at the other end of the range, a true life sentence for a multiple rapist would likely be constitutional. We recognize, as we must, that sex crimes "are a serious matter in light of the potential for both physical and psychological injury and that lengthy sentences are necessary to protect the public from further harm by recidivists." *Wheeler*, 343 Or at 679-80. And defendant is more of a recidivist, committing five public indecency offenses, than other offenders subject to ORS 137.719(1) for the commission of three sex crimes. But five episodes of public indecency, when—as here—accompanied by no meaningful evidence of force or violence and no other forcibly violent sexually charged conduct, when compared with other recidivist penalties, do not constitute the kind of criminal history that can constitutionally justify incarcerating a person with no chance of release.

Reversed and remanded for resentencing.