248 January 30, 2025 No. 5

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

VANESSA AMADA GONZALEZ,
*Petitioner on Review.*

(CC 17CR78352) (CA A173971) (SC S070433)

On review from the Court of Appeals.*

Argued and submitted May 9, 2024.

Jonathan N. Schildt, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Kali Montague, Deputy Public Defender, Oregon Public Defense Commission, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Brittney Plesser and Malori Maloney, Oregon Justice Resource Center, Portland, and Jeffrey Ellis, Oregon Capital Resource Center, Portland, filed the brief for *amici curiae* Oregon Justice Resource Center and Oregon Capital Resource Center.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, James, Masih, Justices, and Nakamoto, Senior Judge, Justice pro tempore.**

GARRETT, J.

The decision of the Court of Appeals is affirmed.

_____
  * Appeal from Marion County Circuit Court, Audrey J. Broyles, Judge. 326 Or App 587, 534 P3d 289 (2023).

  ** Bushong, J., did not participate in the consideration or decision of this case.

**GARRETT, J.**

The issue in this criminal case is whether a 90-month mandatory minimum sentence for defendant's convictions for first-degree arson would violate the proportionality clause of Article I, section 16, of the Oregon Constitution, which provides that "all penalties shall be proportioned to the offense." Defendant was convicted after intentionally causing a fire in her apartment building that resulted in property damage and serious injuries to another resident. During sentencing, after the trial court reviewed various circumstances of defendant's life that it found to be mitigating, the court concluded that the mandatory 90-month prison sentence was unconstitutionally disproportionate to her offense and imposed a 60-month term of probation instead. On the state's appeal, the Court of Appeals reversed, holding that the trial court had erred in relying on defendant's personal characteristics and circumstances in its proportionality analysis. *State v. Gonzalez*, 326 Or App 587, 534 P3d 289 (2023). We allowed defendant's petition for review to consider that question. For the reasons that follow, we affirm the decision of the Court of Appeals.

## I.  BACKGROUND

Defendant lived on the second floor of a two-story apartment building with four units, two on the upper floor and two on the lower. In November 2017, in an apparent suicide attempt, defendant assembled a variety of combustible household items, including furniture and papers, on the landing between the two upper story apartments, just in front of her doorway. After adding flammable items to the pile, including charcoal briquets doused with lighter fluid, defendant lit the items on fire, went back into her apartment, and shut the door. Five other people were in the building at the time.

A man who lived across the street from defendant's building noticed the fire, which by then had spread to the stairwell, and tried to put it out. When his efforts were unsuccessful, he notified the family who lived below defendant and urged them to leave the building. As they left their apartment, defendant began yelling at them from her windowsill, telling them to go back inside and saying that

she wanted them to die with her. The two men who shared the other second-floor apartment soon also noticed the fire. One jumped out a window and was uninjured. The other man tried to leave through the front door of the apartment. When he opened the door, the fire "flashed" and rushed toward him, severely burning him and blocking his escape. He eventually was also able to jump to safety, but he was hospitalized for three months due to his burn injuries, followed by two months in a physical therapy facility, and he has lasting scars on his arm, neck, and shoulder from the burns. Defendant's apartment was not damaged; her door remained closed, which protected it from the heat and fire.

Defendant was charged with, among other things, five counts of attempted murder, five counts of first-degree arson, and one count of second-degree assault. At the ensuing bench trial, defendant presented evidence that, for several years preceding the incident, she had experienced physical and emotional trauma as a result of mental illness. She also presented evidence that, in the weeks before the fire, she had attempted suicide multiple times, she had been evicted from her apartment, her electricity had been shut off, her cousin had died from a drug overdose, and the Department of Human Services had removed her children from her care. Additionally, defendant presented evidence that she had used methamphetamine during that period, which had triggered a psychotic episode in her. Defendant conceded that she was not relying on the affirmative defense of guilty except for insanity (GEI), which requires a showing of a "qualifying mental disorder."[1] However, she argued that the trial court should find that her voluntary intoxication due to methamphetamine use had negated her intent or that she had "mental difficulties coupled with" methamphetamine use that negated her intent under the "partial

_____

[1] Under ORS 161.295(1), a person is guilty except for insanity, "if, as a result of a qualifying mental disorder at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law." Subsection (2) of that statute provides that the term "qualifying mental disorder" does not include "abnormalit[ies] manifested only by repeated criminal or otherwise antisocial conduct" or "constituting solely a personality disorder." At trial, a defense expert testified that, at the time of the alleged offenses, defendant was experiencing a "stimulant-induced psychotic disorder," which the parties agree is not a qualifying mental disorder for purposes of the guilty-except-for-insanity defense.

responsibility doctrine." *See* ORS 161.125 (voluntary intoxication is not a defense but defendant may offer evidence that defendant used drugs when relevant to negate an element of the crime, including intent); ORS 161.300 (evidence of a "qualifying mental disorder" is admissible if relevant to the issue of whether the actor did or did not have "the intent which is an element of the crime").

The trial court rejected those arguments. It found that defendant "intentionally set the fire [and] *** intentionally damaged property *** and thereby recklessly placed others in danger of physical injury," and it convicted her of five counts of first-degree arson.[2] The court rejected defendant's contention that she had lacked the requisite mental state for that crime because, "despite [her] mental health considerations," the court found that defendant took "volitional steps" in starting the fire. The court also found that the arson had "presented a threat of serious physical injury," a finding that both increased the crime seriousness of the offense for purposes of the sentencing guidelines and subjected defendant to a 90-month mandatory minimum prison sentence under ORS 137.700(2)(b)(A).

The court acquitted defendant on the charges of attempted murder, finding that she had not had the specific intent to kill anyone. The court also acquitted defendant of the charge of second-degree assault (because that charge, too, required an intentional mental state that the court found defendant to have lacked), but it convicted defendant of the charge of third-degree assault for recklessly causing serious physical injury to her neighbor, under circumstances manifesting extreme indifference to the value of human life. ORS 163.165(b) (so defining third-degree assault).

At sentencing, defendant argued that, as applied to her, the 90-month mandatory minimum sentence for arson was unconstitutionally disproportionate under Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution.

The trial court agreed with defendant. The court acknowledged that defendant's conduct was "egregious,"

---

[2] Those counts were merged at sentencing.

that she had engaged in volitional acts in setting the fire with other residents present, that one resident had suffered "significant and substantial" physical injuries because of her conduct, and that all residents of the building had suffered emotional injuries. In addition, the court agreed with the state that a 90-month sentence was not facially disproportionate—that is, it was not disproportionate in relation to the elements of the crime or in relation to other crimes that result in similar sentences.

However, in the trial court's view, those factors were not exclusive. The court had considered in mitigation the fact that defendant had no criminal history, but the court also stated that it could consider "mitigating facts in assessing moral culpability," such as the "psychological paradigm of [defendant], all factors internal and external as a factor in the determination of proportionality." In the court's view, those factors included defendant's unstable childhood, later traumatic events that she had experienced, the multitude of stressful events that had occurred in the weeks and months preceding the fire, the influence of defendant's methamphetamine use on her psychological health, and her diagnoses of depression, adjustment disorder, anxiety, and post-traumatic stress disorder. The court observed that, despite facing those challenges and obstacles, defendant had gone through life with no interaction with the criminal justice system until a "convergence of stressors"—including, among other things, her suicide attempts, the eviction notice, and the loss of her children—"caused her to snap." Finally, the court observed that, since her incarceration, defendant's mental health had improved and that she had taken responsibility for her conduct and was remorseful.

For all those reasons, the court concluded that the 90-month mandatory minimum sentence was disproportionate as applied. The court departed from that sentence as well as the guidelines range, which could have resulted in an even longer sentence, and sentenced defendant to a 60-month term of supervised probation with orders to complete drug-addiction and mental-health treatment.

The state appealed, and the Court of Appeals reversed. That court reviewed the trial court's ruling for

legal error and concluded that the 90-month mandatory minimum sentence required by ORS 137.700(2)(b)(A) was not constitutionally disproportionate as applied. *Gonzalez*, 326 Or App at 589. We allowed defendant's petition for review.

## II.   ANALYSIS

Article I, section 16, of the Oregon Constitution requires criminal sentences to be proportionate to the offense, providing, as pertinent here, that "[c]ruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense."[3] In *State v. Wheeler*, 343 Or 652, 667, 175 P3d 438 (2007), this court undertook a historical examination of the meaning of Article I, section 16, observing that,

> "[a]t the most basic level, the framers' concern was that the penalty imposed on a criminal defendant be proportioned to the specific offense for which the defendant was convicted—that it bear the appropriate comparative relation to the severity of that crime."

(Internal quotation marks omitted.) Since 1921, we have repeatedly stated that a sentence violates the proportionality provision of Article I, section 16, if it "shock[s] the moral sense" of reasonable people. *See, e.g.*, *Sustar v. County Court for Marion Co.*, 101 Or 657, 665, 201 P 445 (1921); *State v. Teague*, 215 Or 609, 611, 336 P2d 338 (1959); *State v. Rogers*, 313 Or 356, 380, 836 P2d 1308 (1992) (all using that test). Whether a sentence "shocks the moral sense" of reasonable people and, thus, is unconstitutional, is a legal question; in answering that question, we are bound by the trial court's findings of historical facts if they are supported by evidence in the record. *See State v. Ryan*, 361 Or 602, 614-15, 396 P3d 867 (2017) (court reviews constitutionality of a sentence for legal error under Article I, section 16).

---

[3] Defendant contends that imposing the mandatory minimum sentence also would be unconstitutional under the Eighth Amendment to the United States Constitution, which provides, "Excessive bail shall not be required, no excessive fines imposed, nor cruel and unusual punishments inflicted." However, defendant does not develop an argument under the federal constitution that is independent of or distinct from her argument under the Oregon Constitution, and we do not separately consider defendant's constitutional argument under the Eighth Amendment.

The primary authority to determine the gravity of an offense and the appropriate punishment lies with the legislature. *State v. Althouse*, 359 Or 668, 683-84, 375 P3d 475 (2016). Moreover, "respect for the separation of powers and the legislature's authority to set criminal penalties means that the court's role [in assessing proportionality] is a limited one." *Wheeler*, 343 Or at 672. We will not second-guess the legislature's determination of penalties or range of penalties for a crime unless a punishment is so disproportionate that it shocks the moral sense of reasonable people. *State v. Rodriguez/Buck*, 347 Or 46, 58, 217 P3d 659 (2009). Under that standard, we have explained, this court will "'find a penalty to be disproportionately severe for a particular offense only in rare circumstances.'" *Id.* (quoting *Wheeler*, 343 Or at 670).

In this case, the Court of Appeals applied the analytical framework for evaluating proportionality that this court first described in *Rodriguez/Buck* and has applied several times since then, including in *Althouse*, 359 Or at 685; *State v. Davidson*, 360 Or 370, 384, 380 P3d 963 (2016); and *Ryan*, 361 Or at 615. We briefly describe that framework and then its application here.

A.   *The* Rodriguez/Buck *Framework*

Defendant challenges the constitutionality of her sentence within the framework for assessing such challenges that this court first articulated in *Rodriguez/Buck*. There, we observed:

> "In declaring unconstitutional a punishment that is so disproportionate, when compared to the offense, so as to 'shock the moral sense' of reasonable people, this court has identified at least three factors that bear upon that ultimate conclusion: (1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant."

347 Or at 58. We further stated that the "offense" for purposes of Article I, section 16, is "the specific defendant's particular conduct toward the victim that constituted the crime, as well as the general definition of the crime in the statute." *Id.* at 62. And, we went on,

"[i]n considering a defendant's claim that a penalty is con-
stitutionally disproportionate as applied to that defendant,
then, a court may consider, among other things, the specific
circumstances and facts of the defendant's conduct that
come within the statutory definition of the offense, as well
as other case-specific factors, such as characteristics of the
defendant and the victim, the harm to the victim, and the
relationship between the defendant and the victim."

*Id.*

In *Rodriguez/Buck*, we considered two consolidated
cases, in each of which the defendant had been convicted
of first-degree sexual abuse and sentenced to a mandatory
minimum term of 75 months' imprisonment for a single,
brief, sexual contact with a child: over-the-clothes touch-
ing of the sexually intimate parts of a child in one case and
holding the child's head to the defendant's clothed breasts in
the other. This court held that those sentences were exces-
sive as applied to those defendants, principally because nei-
ther defendant had had any prior criminal charges, arrests,
or reported police contact; the presumptive non-Measure 11
sentence for their crimes was 16-18 months in prison; and
the 75-month mandatory minimum sentence for first-degree
sexual abuse applied to a broad range of conduct, including
conduct that was far more serious than that for which the
defendants had been convicted. *Id.* at 70-77.

Similarly, in *Davidson*, this court held that a statu-
torily required life sentence without the possibility of parole
was unconstitutionally excessive for a defendant's third con-
viction for public indecency for exposing himself at a public
park. 360 Or at 391. We reasoned that public indecency is
generally considered a high-level misdemeanor or a low-level
felony; it is not considered to be as serious as other sexual
offenses, such as those that involve nonconsensual sexual
contact or sexual behaviors targeting children. *Id.* at 387.
Yet the sentence that had been imposed on the defendant
was the most severe penalty that exists in Oregon law other
than the death penalty. *Id.* We reached a different conclu-
sion in *Althouse*, which, like *Davidson*, involved a defendant
who had been convicted of public indecency and sentenced
to life without parole under a repeat-offender statute. In
*Althouse*, however, the defendant had an extensive history of

more serious sex crimes, including sexual abuse and sodomy of children. 359 Or at 687 ("Given the seriousness of defendant's repeated sexual misconduct and the danger that it forecasts for others, we cannot say that imposing presumptive life sentence in response to defendant's pattern of criminal behavior violated Article I, section 16.").

B.  *"Personal Characteristics" and* State v. Ryan

As noted above, *Rodriguez/Buck* permits a court to consider "case-specific factors, such as characteristics of the defendant" in assessing the gravity of the offense for purposes of a constitutional disproportionality analysis.[4] 347 Or at 62. *Rodriguez/Buck* did not further explain what "characteristics of the defendant" may be relevant, as no such characteristics were pertinent to our analysis in that case. This court's first opportunity to explore that issue came in *Ryan*, where we addressed whether a defendant's intellectual disability is a personal characteristic that may affect the gravity of the offense in a proportionality analysis. The defendant in that case received a 75-month mandatory minimum sentence for over-the-clothes touching of the sexually intimate parts of two victims aged nine and 14. At his sentencing, the defendant argued that the 75-month minimum sentence for first-degree sexual abuse, which was mandated by ORS 137.700(2)(a)(P), would be disproportionate as applied to him because of his intellectual disability. 361 Or at 604. The trial court ruled that the mandatory minimum sentence was not disproportionate as applied to the defendant, but the court did not indicate that it had considered the defendant's intellectual disability as a factor in its analysis. *Id*.

On review, this court began by noting that the United States Supreme Court and other federal courts had

_____

[4] In *Rodriguez/Buck*, the court stated that it had identified "at least" three factors that bear on whether a punishment is so disproportionate when compared to the offense as to shock the moral sense of reasonable people. In other words, the court did not intend the three factors that we described above to be an exclusive list of factors to be considered. We observe that "characteristics of the defendant" is not a particularly close fit when considering the gravity of the offense under the first *Rodriguez/Buck* factor, and perhaps it would make more sense to consider the subjective characteristics of the defendant as a separate factor that may affect the moral sense of reasonable people that a punishment is disproportionate. But the parties in this case dealt with defendant's mental illness in the context of discussing the gravity of the offense, as this court did in *Ryan*. For that reason, we take the same approach here.

previously addressed proportionality challenges under the Eighth Amendment by intellectually disabled offenders sentenced to death and to mandatory minimum sentences. *Id*. at 616. We observed that the Supreme Court, in *Atkins v. Virginia*, 536 US 304, 122 S Ct 2242, 153 L Ed 2d 335 (2002), had held that the Eighth Amendment prohibits the execution of an intellectually disabled offender, because "'the American public, legislators, scholars, and judges' had deliberated over the question of the death penalty for the intellectually disabled and had come to a consensus that it should be prohibited" and the Court's own judgment was that there was no reason to disagree with that consensus view. *Ryan*, 361 Or at 617-18 (quoting *Atkins*, 536 US at 307). As we explained in our opinion in *Ryan*, the Court in *Atkins* had concluded that, for an intellectually disabled person, the penological justifications for the death penalty are diminished because intellectually disabled persons have a reduced ability "'to understand and process information, to learn from experience, to engage in logical reasoning, [and] to control impulses.'" *Id*. at 618 (quoting *Atkins*, 536 US at 320 (brackets in *Ryan*)).

This court in *Ryan* further noted that, despite the Court's pronouncements about the reduced justification for treating intellectually disabled offenders the same as other offenders, lower federal courts had routinely held that *Atkins* applied only to offenders otherwise subject to the death penalty; they had declined to apply the same reasoning in proportionality cases involving mandatory prison sentences. *Id*. at 619. However, this court took note of a legal commentator's statement that "'[j]ust about everyone working in the field'" believed that "'the diminished intelligence of the offender ought to be a major factor in determining appropriate sentences.'" *Id*. at 620 (quoting Paul Marcus, *Does* Atkins *Make a Difference in Non-Capital Cases? Should It?*, 23 Wm & Mary Bill Rts J 431, 456 (2014). We acknowledged "the force of that view" and held:

> "Evidence of an offender's intellectual disability therefore is relevant to a proportionality determination where sentencing laws require the imposition of a term of imprisonment without consideration of such evidence. Accordingly, we conclude that, where the issue is presented, a sentencing court must consider an offender's intellectual disability

in comparing the gravity of the offense and the severity of a mandatory prison sentence on such an offender in a proportionality analysis under *Rodriguez/Buck*."

*Id.* at 620-21.

We then turned to examine *how* that consideration should affect the proportionality analysis under the Oregon Constitution. *Id.* at 621. Reasoning that "there exists a broad spectrum of intellectual disabilities that may reduce, but not erase" a person's culpability, we determined that a "one-size-fits-all approach is not appropriate." *Id.* Rather, a sentencing court's findings "as to an intellectually disabled offender's level of understanding of the nature and consequences of his or her conduct and ability to conform his or her behavior to the law" will be relevant to the proportionality of a sentence as applied to the offender. *Id.*

In *Ryan*, the undisputed evidence at sentencing showed that the defendant had an IQ score of between 50 and 60, corresponding to a mental age of 10, which, the court observed, was two years below the minimum age for establishing criminal responsibility in Oregon, as set out in ORS 161.290.[5] *Id.* at 623. We explained that the legislature's pronouncement on the age of criminal responsibility was relevant to the proportionality analysis "because it is objective evidence of a societal standard that eschews treating persons with the attributes of a pre-teen child as if they were normally abled adult offenders." *Id.* at 624 Ultimately, we concluded that the trial court had erred when it compared the gravity of the defendant's offense and the severity of the mandatory minimum sentence without sufficiently considering evidence that the defendant's "age-specific intellectual capacity fell below the minimum level of criminal responsibility for a child." *Id.* at 625-26.

In a concurring opinion, Justice Balmer emphasized his understanding that the majority's holding was

---

[5] ORS 161.290 provides:

"(1) A person who is tried as an adult in a court of criminal jurisdiction is not criminally responsible for any conduct which occurred when the person was under 12 years of age.

"(2) Incapacity due to immaturity, as defined in subsection (1) of this section, is a defense."

more limited than the broad rule that the defendant had proposed. As the concurrence explained, whereas the defendant in *Ryan* had urged that "any personal characteristics that 'mitigate[] culpability'" are relevant to the Article I, section 16, proportionality analysis, the majority had adopted a "narrower approach" in concluding, on the basis of *Atkins* and ORS 161.290, that the sentencing court was required to have considered the evidence of the defendant's intellectual functioning. *Id.* at 626, 629, 634 (Balmer, J., concurring).

In this case, after discussing both the majority and concurring opinions in *Ryan*, the Court of Appeals explained that its own post-*Ryan* cases have "restricted the consideration of a defendant's personal characteristics to those affecting intellectual capacity." *Gonzalez*, 326 Or App at 600-01. The court went on to note that, "in contrast with *Ryan*, defendant has not identified any statutory or other basis for concluding that there is a 'societal standard that eschews' treating persons with defendant's mental health attributes the same way that other adults are treated where, as here, they are found to have acted with the requisite culpable mental state." *Id.* at 601-02 (quoting *Ryan*, 361 Or at 624).

C.  *Application*

Of the three factors identified in *Rodriguez/Buck*—a comparison of the severity of the penalty and the gravity of the crime; a comparison of the penalties imposed for other, related crimes; and the criminal history of the defendant—the first is the focus of our analysis. Defendant does not argue that a 90-month mandatory minimum sentence for first-degree arson is disproportionate in comparison with penalties imposed for other crimes. Nor does she argue that her lack of a criminal history should weigh heavily under the circumstances of this case. Rather, defendant's argument focuses on the first *Rodriguez/Buck* factor, and, specifically, the extent to which her personal characteristics should affect the court's view of the severity of the penalty in relation to the gravity of the crime.

Before we turn to the first *Rodriguez/Buck* factor, we consider the "offense" that defendant committed, which,

as we explained in *Rodriguez/Buck*, means both defendant's particular conduct and the general statutory definition. 347 Or at 62. Under ORS 164.325, a person commits first-degree arson if, by means of fire or explosion, the person intentionally damages another's property and recklessly places another person in danger of physical injury. Here, the trial court found that defendant intentionally set a fire in the landing of her apartment building, intentionally damaged property, and recklessly placed others in danger of physical injury. Defendant's conduct thus falls squarely within the definition of first-degree arson.

The first *Rodriguez/Buck* factor requires a comparison of the severity of the penalty and the gravity of the crime. We begin with an examination of the penalty, both in relation to other conduct that is subject to the same sentence and in relation to the penalties imposed for other crimes, because that penalty is "an external source of law" that assists the court in determining whether imposition of that penalty would shock the moral sense of reasonable people. *Wheeler*, 343 Or at 671. As we have said, the legislature's enactment of a particular penalty does not itself establish constitutional proportionality—the courts ultimately must decide whether penalties exceed constitutional limits. *State v. Bartol*, 368 Or 598, 613, 496 P3d 1013 (2021). But enactment of the penalty is important because it is evidence of societal standards and enables the objective comparisons that Article I, section 16, requires. A court can compare the relative "'harm caused or threatened to the victim or society, and the culpability of the offender'" by looking to the "'widely shared views as to the relative seriousness of crimes'" that "'the criminal laws make clear.'" *Rodriguez/Buck*, 347 Or at 63 (quoting *Solem v. Helm*, 463 US 277, 292-93, 103 S Ct 3001, 77 L Ed 2d 637 (1983)).

Defendant committed first-degree arson by intentionally setting a fire that damaged property and recklessly placed other people in danger of physical injury. When, as here, that offense "represented a threat of serious physical injury," it is subject to the mandatory minimum sentence of 90 months in prison. ORS 137.700(2)(b)(A). We also note that, under Oregon's felony sentencing guidelines, first-degree

arson is ranked at crime-seriousness levels 7-9, based on the type and amount of property damage, but it is ranked at level 10 if the offense also "represented [a] threat of serious injury." OAR 213-017-0002(11). Arson that threatens serious physical injury carries a presumptive sentence of up to 130 months in prison, depending on the person's criminal history—and that sentence is subject to doubling by departure. OAR 213-004-0001, App 1 (sentencing guidelines grid); OAR 213-008-0003 (durational departures shall not total more than double the maximum duration of a presumptive prison term). If a court finds substantial and compelling reasons to depart from the presumptive guidelines sentence range,[6] even a person with no criminal history—such as defendant— could receive a sentence of 116-120 months in prison for arson that threatened serious physical injury. OAR 213-004-0001, App 1 (sentencing guidelines grid). In other words, had defendant been sentenced under the guidelines, she could have received an even longer sentence than the 90-month mandatory minimum sentence required by ORS 137.700.

The legislature thus regards first-degree arson as a very serious crime, particularly when it threatens serious physical injury. In this case, unlike in *Rodriguez/Buck* and *Davidson*, the gravity of defendant's conduct is not "relatively minor" in comparison to the range of other conduct that is subject to the same mandatory minimum sentence for first-degree arson. *See Davidson*, 360 Or at 389 (finding that public indecency is "relatively minor in comparison with the majority of the other sex offenses identified in ORS 163A.005(5) that may result in a true-life sentence under ORS 137.719"). As the trial court found, defendant's conduct was "egregious," it caused "emotional injury" to all victims, and it caused "significant and substantial" physical injury to the neighbor. We also observe that first-degree arson is not less serious than other crimes carrying a 90-month mandatory minimum sentence under ORS 137.700. Those include attempt or conspiracy to commit murder, ORS 137.700(2)(D); first-degree    assault,    ORS    137.700(2)(G);    first-degree

---

[6] The state asserts that, based on the facts of this case, it could have pursued a departure sentence on the ground that defendant's conduct "resulted in permanent injury" to the neighbor. OAR 213-008-0002(1)(b)(I) (that offense resulted in permanent injury is aggravating factor to be considered in determining whether substantial and compelling reasons for a departure exist).

kidnapping, ORS 137.700(2)(I); and first-degree robbery, ORS 137.700(2)(R). We therefore conclude that, apart from consideration of any personal characteristic of defendant that may have constitutional significance, imposition of a 90-month mandatory minimum sentence for her conduct would not "'shock the moral sense' of reasonable people." *Rodriguez/Buck*, 347 Or at 58.

In this case, defendant asserts that mental illness, like intellectual disability, is a "characteristic of the defendant" that courts must consider in a proportionality analysis under Article I, section 16. Pointing out that, in *Ryan*, this court identified a societal consensus that a person's intellectual functioning makes the person less culpable than other offenders, defendant contends that such a societal consensus also exists for mental illness. She points first to the United States Supreme Court's decision in *Penry v. Lynaugh*, 492 US 302, 319, 109 S Ct 2934, 106 L Ed 2d 256 (1989), *abrogated by Atkins*, 536 US at 321, in which the Court held that the jury could consider the facts that the defendant was intellectually disabled, with a mental age of six and a half years old, and that he had a history of child abuse, when deciding whether to impose the death penalty. Defendant argues that *Penry* supports his position, because, in that case, the Court stated:

> "If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

492 US at 319 (internal quotation marks omitted). In addition, defendant points to, among other things, a post-conviction case in which the Court held that a lawyer provided ineffective assistance of counsel in failing to investigate the defendant's mental health as a mitigating factor in his sentencing, *Porter v. McCollum*, 558 US 30, 40, 130 S Ct 447, 175 L Ed 2d 398 (2009); a case in which the Court limited the detention of a mentally incompetent defendant to a reasonable period of time to determine whether he would

attain the capacity to stand trial, *Jackson v. Indiana*, 406 US 715, 738, 92 S Ct 1845, 32 L Ed 2d 435 (1972); and a case in which the Court held that the Eighth Amendment prohibits executing "insane" persons, *Ford v. Wainwright*, 477 US 399, 410, 106 S Ct 2595, 91 L Ed 2d 335 (1986).

Defendant acknowledges that none of those cases holds that mental illness is a characteristic that must be considered as part of the proportionality analysis in noncapital cases. Nonetheless, defendant argues that mental illness, like intellectual disability, reduces culpability because it, too, reduces the defendant's ability "'to understand and process information, to learn from experience, to engage in logical reasoning, [and] to control impulses.'" *Ryan*, 361 Or at 618 (speaking of intellectual disability (quoting *Atkins*, 536 US at 320)). Thus, defendant argues, the same rationale that animated our decision in *Ryan* suggests that any personal characteristic that can be thought to influence a person's conduct and thereby make a person less blameworthy may be considered in the court's evaluation of the "gravity of the offense" for purposes of a proportionality analysis.

Defendant faults the Court of Appeals for reading *Ryan* too "narrowly" to the extent that, in her view, that court understood *Ryan* to hold that intellectual disability is the only personal characteristic that may affect the proportionality analysis. Defendant acknowledges that ORS 161.290 was crucial to the court's analysis in *Ryan*, but she argues that, in evaluating whether a punishment in a particular case would conflict with "societal standards," legislative enactments cannot be the only source of such standards. She contends that the Court of Appeals' decision in this case did not leave room for consideration of indicia of a societal consensus that individuals with mental illness also may be less culpable than those without mental illness.

We agree with defendant that *Ryan* did not hold that no characteristic other than intellectual disability may ever be relevant. In fact, it neither embraced nor rejected the proposition that other personal characteristics may be relevant. The court decided the case before it, which concerned the defendant's intellectual disability. However, the Court of Appeals' analysis in this case was consistent with

*Ryan*. Contrary to defendant's argument on review, the Court of Appeals did not interpret *Ryan* to foreclose the possibility that personal characteristics other than intellectual disability might, theoretically, be relevant to constitutional proportionality in a particular case. After discussing *Ryan*, that court went on to explain what was present in *Ryan* that is not present here:

> "[I]n contrast with *Ryan*, defendant has not identified any statutory or other basis for concluding that there is a 'societal standard that eschews' treating persons with defendant's mental health attributes the same way that other adults are treated where, as here, they are found to have acted with the requisite culpable mental state, notwithstanding the presence of mental health issues."

*Gonzalez*, 326 Or at 601-02 (quoting *Ryan*, 361 Or at 624). As that passage indicates, the Court of Appeals looked for indications of a consensus that "persons with defendant's mental health attributes" are less culpable than those without them, and it sought such indications in "statutory or other" bases.

The court went on to explain that "the law accounts for" the possibility that mental health may affect culpability by providing for the GEI defense and by allowing a defendant to use evidence of mental illness to negate a showing that he or she possessed the necessary mental state for a crime. *Id.* at 602. In light of that, the court concluded, "it is difficult to see how such conditions might then also be relevant" to concluding that a defendant who *had* been properly found guilty was nevertheless less culpable than other defendants. *Id.* But acknowledging that it is "difficult to see" how mental illness might affect a person's culpability when that person was found to have taken "volitional steps" and to have acted intentionally in committing a crime does not amount to a holding that no characteristic other than intellectual disability may ever be relevant.

As we have explained, *Ryan* did not simply rely on this court's own perception of a societal consensus that intellectual disability can, in some general sense, reduce a person's culpability. Rather, in applying the instruction from our case law to determine whether a sentence would "shock

the moral sense of reasonable people," this court relied on "objective evidence of a societal standard" that supplied a basis to determine more precisely when an intellectually disabled offender's culpability is different from that of other offenders. *Ryan*, 361 Or at 624. As discussed, in *Ryan*, that objective evidence was the legislature's enactment of ORS 161.290, which provides that a person is not criminally responsible for any conduct that occurred when the person was under 12 years of age. *Id.*

Defendant is correct that *Ryan* does not compel the conclusion that *only* a legislative enactment may provide the evidence of such a "societal standard." But the Court of Appeals appears to have correctly understood that as well, as evidenced by its observation that defendant had identified "no statutory *or other* basis" for the societal standard of which defendant urges recognition. *Gonzalez*, 326 Or App at 602 (emphasis added). Because of the legislature's primary role in determining the punishments for criminal conduct, it is appropriate that, in determining whether a societal standard exists that militates against imposing a punishment that would otherwise be required, courts will give great weight to the existence or absence of legislative enactments bearing on such a standard. However, that does not make the existence or absence of legislation dispositive in the analysis. As we stated in *Bartol*, "legislative enactments are strong indicators of current societal standards, but [they] are not dispositive of whether a sentence comports with those standards." 368 Or at 613. At bottom, however, as both *Bartol* and *Ryan* reflect, there must be some objective basis for allowing this court to discern a societal standard that requires treating persons with certain attributes differently for purposes of criminal culpability—even in the face of a legislative policy (such as a mandatory minimum sentence) that would otherwise require them to be punished the same as others.

We turn to defendant's argument that, in this case, the trial court was correct to take her mental illness into account in its proportionality analysis. There is no doubt of the general proposition that mental illness *may* bear on culpability. That is evident in the legislature's enactment of

ORS 161.295, which provides a defense for persons with a "qualifying mental disorder" who lack the capacity to appreciate the criminality of their conduct or conform their conduct to the requirements of the law, as well as ORS 161.300, which allows defendants to introduce evidence that they suffer from a "qualifying mental disorder" to show that they did not have the requisite intent to commit the charged offense. Indeed, Oregon, like other states and jurisdictions around the world, has recognized an "insanity" defense for over a hundred years, demonstrating that society has long understood the relationship between mental illness and criminal responsibility. *See, e.g.*, *State of Oregon v. Zorn*, 22 Or 591, 599, 30 P 317 (1892) (recognizing insanity defense for a defendant who "was laboring under such a defect of reason, from disease of the mind, as not to know the nature, quality, or consequences of the act he was committing, or that if he did know it, he did not clearly understand what he was doing was wrong"); *see also Kahler v. Kansas*, 589 US 271, 283, 140 S Ct 1021, 206 L Ed 2d 312 (2020) ("[F]or hundreds of years jurists and judges have recognized insanity (however defined) as relieving responsibility for a crime."); *Daniel M'Naghten's Case*, 8 English Reports 718, 722 (1843) ("[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.").

Those authorities show that persons who, by reason of their mental illness, lack the capacity to appreciate the criminality of their conduct or to conform their conduct to the requirements of the law are not criminally responsible for their conduct. Here, however, the trial court found that defendant did have the requisite intent to commit first-degree arson, and, necessarily, that she did appreciate the criminality of her conduct. To be consistent with *Ryan*, defendant's argument requires identifying some basis for concluding that society regards a person with mental health attributes like hers as less culpable than other offenders *despite* the fact that, according to the trial court's findings, defendant retained the capacity to appreciate the criminality

of her conduct and to form the intent to commit a crime. The record in this case does not permit such a conclusion.

Defendant asserts, generally, that "mentally ill people are less morally culpable than others." But the term "mental illness" encompasses a vast array of conditions, and defendant's assertion fails to account for either the range of disorders that may fall within the scope of that term or the different ways that such disorders may affect those who suffer from them. Importantly, defendant directs us to no authority for a generally accepted principle that any person with a mental illness, of whatever nature, is so much less morally culpable for criminal conduct than a person without a mental illness that imposition of a mandatory minimum sentence would be unconstitutional.

Indeed, defendant acknowledges that "not all mental illnesses will require a finding that a lengthy mandatory prison sentence is unconstitutional, because like people with intellectual disabilities, not all people with mental illness will be so impaired as to fall within the range of mentally ill offenders who are deemed less morally culpable than those with no excuse." Given that acknowledgment, the only question before us is whether we can identify a societal standard that requires a court to view a person with a constellation of mental health attributes comparable to defendant's as so much less culpable than people without those attributes that the mandatory 90-month sentence cannot constitutionally be imposed. In defendant's case, the record reflects that her diagnoses of mental disorders include, among other things, depression, anxiety, adjustment disorder, and opioid-use disorder. Defendant has not cited any evidence of a societal standard recognizing that people who suffer from those disorders—but who have the ability to form the requisite mental state and appreciate the gravity of their conduct—have reduced moral culpability for their criminal conduct to the extent that imposing the mandatory minimum sentence would violate Article I, section 16.

Defendant intentionally committed arson that recklessly put five other people at risk of serious physical injury and caused serious physical injury to one of those people. In light of the trial court's specific findings that defendant

had the requisite mental state and possessed the ability to appreciate the criminality of her conduct, and in the absence of evidence of a societal standard recognizing that people with mental health issues similar to hers are less morally culpable for their crimes, requiring defendant to serve the 90-month minimum sentence that the legislature chose for that crime does not shock the moral sense of reasonable people.

The decision of the Court of Appeals is affirmed.